No.: 1:21-cv-805- LCB-JLW

|  |  |  |  |
|---|---|---|---|
| GREGORY PAUL BURGESS and wife, JILL HUDSPETH BURGESS, | ) ) ) ) | | |
| Plaintiff, | ) ) ) | **FIRST AMENDED COMPLAINT** | |
| vs. | ) ) | | |
| UNITED STATES OF AMERICA (USA), | ) ) | | |
| Defendant. | ) ) ) ) | | |

NOW COMES the Plaintiffs, Gregory Paul Burgess and Jill Hudspeth Burgess, by and through their attorney, Gregory M. Kash of the Law Offices of Gregory M. Kash of Raleigh, North Carolina, amending their Complaint as a matter of right, complaining of the Defendants, and alleges and states that:

### PARTIES, JURISDICTION SERVICE OF PROCESS AND VENUE

1.      At all times relevant to the complaints described herein, Plaintiff Gregory Paul Burgess was an inmate at Federal Correctional Complex, Butner (hereinafter "Butner FCC") in Butner, North Carolina.  Both prior to and after his incarceration at Butner FCC, Plaintiff Gregory Burgess was a citizen and resident of Winston-Salem, Forsyth County, North Carolina.

2.      At all times relevant to the allegations of the Complaint, as described herein, Plaintiff Jill Hudspeth Burgess was the wife of Gregory Paul Burgess, having been married on September 6, 1997.  At all times relevant to the allegations in the Complaint, and prior to and

1

subsequent to Gregory Burgess' incarceration, Plaintiff Jill Hudspeth Burgess was a citizen and resident of Winston-Salem, Forsyth County, North Carolina.

3.      The Defendant is the United States of America.

4.      This Federal District Court has jurisdiction over this cause, as this action is brought pursuant to and in compliance with 28 U.S.C. §§1346(b), 2671-2680 et seq., commonly referred to as the "Federal Torts Claims Act," which vests exclusive subject matter jurisdiction of Federal Torts Claims litigation in the Federal District Court.

5.      This claim arises out of the negligent medical care of Gregory Paul Burgess (hereinafter " Mr. Burgess"). The ancillary claim of Jill Hudspeth Burgess (hereinafter "Jill Burgess") is a loss of consortium claim of Jill Burgess arising out of the severe injuries to her husband, Greg Burgess.

6.      The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on Sandra J. Hairston, Acting United States Attorney for the Middle District of North Carolina (MDNC), attention Civil Process Clerk, at 101 South Edgeworth Street, 4th Floor, Greensboro, NC 27401 by certified mail, return receipt requested;  and by serving a copy of the Summons and Complaint on Merrick B. Garland, Attorney General of the United States, United States Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001, by certified mail, return receipt requested.

7.      Pursuant to 28 U.S.C. §§ 1391(e), venue is proper in this district as the United States is a Defendant and pursuant to 28 U.S.C. § 1402(b) venue is proper in this district because Plaintiffs reside in this district.

**LIABILITY OF THE UNITED STATES OF AMERICA**

8. This claim is commenced and prosecuted against the United States of America pursuant to and in compliance with 28 U.S.C. §§ 2671-2680 et seq., commonly referred to as the "Federal Torts Claims Act" (FTCA). Liability of the United States is predicated specifically on Title 28 U.S.C. §§ 1346(b)(1) and 2674 because the personal injuries and resulting damages of which complaint is made, were proximately caused by the negligence, wrongful acts and/ or omissions of employees of the United States of America at the Butner Federal Correctional Complex, located in Butner, North Carolina, while acting within the scope of their office or employment, under circumstances where the United States of America, if a private person, would be liable to Plaintiff in the same manner and to the same extent as a private individual. Butner FCC is a United States federal prison in North Carolina for male inmates of all security levels who have special health needs. The Butner FCC is operated by the Federal Bureau of Prisons, a division of the United States Department of Justice, an agency of the Defendant, United States of America.

**JURISDICTIONAL PREREQUISITES UNDER FTCA**

9. On December 9, 2020, Plaintiffs Gregory Burgess and Jill Burgess timely filed Form 95 administrative claims with the appropriate federal agency, the United States Department of Justice, at Federal Torts Claims Act Section, Torts Branch, Civil Division, U.S. Department of Justice, 175 N Street, NE, Washington, DC 20002, and through the Federal Bureau of Prisons, at U.S. Department of Justice, Federal Bureau of Prisons, Mid-Atlantic Regional Office, 302 Sentinel Drive, Suite 200, Annapolis Junction, MD 29701, pursuant to 28 U.S.C. §§ 2401(b), 2675.

10. On December 10, 2020, Plaintiffs Gregory Burgess and Jill Burgess timely filed Form 95 administrative claims with the appropriate federal agency, by hand-delivery of Form 95 administrative claims to Christina A. Kelly, Esq., Butner Legal Clinic, Federal Correctional

3

Complex, 2 Old North Carolina Highway 75, Butner, North Carolina 27509, pursuant to 28 U.S.C. §§ 2401(b), 2675.

11.  Plaintiffs' counsel received correspondence dated December 14, 2020 from the U.S. Department of Justice, Civil Division, Torts Branch, Federal Torts Claims Act Staff, Post Office Box 888, Benjamin Franklin Station, Washington DC 20044, acknowledging receipt of the claims of Plaintiffs. Regional Counsel for the United States Department of Justice, Federal Bureau of Prisons, Mid-Atlantic Region, acknowledging receipt of Plaintiffs Gregory Burgess and Jill Burgess Federal Tort Claims on December 10, 2020, advising said claims were being forwarded to the Federal Bureau of Prisons.

12.  Plaintiffs' counsel received two letters dated December 15, 2020 from the U.S. Department of Justice, Federal Bureau of Prisons (BOP), Mid-Atlantic Region, Butner Legal Center, P.O. Box 1600, Butner, North Carolina 27509, acknowledging the receipt of the administrative tort claims filed by Plaintiffs Gregory Paul Burgess and Jill Hudspeth Burgess, noted to be received December 10, 2020. The Gregory Paul Burgess administrative tort claim was assigned a BOP claim number TRT-MXR-2021-01409. The Jill Hudspeth Burgess administrative tort claim was assigned a BOP claim number TRT-MXR-2021-01414.

13.  On June 9, 2021, the United States Department of Justice, Federal Bureau of Prisons, Mid-Atlantic Region, Butner Legal Center, P.O. Box 1600, Butner, North Carolina 27509, by Michael D. Frazier, Regional Counsel, issued letters to counsel for the Plaintiffs by CERTIFIED MAIL denying Plaintiffs Gregory Paul Burgess and Jill Hudspeth Burgess Federal Tort Claims.

14.  This Complaint has been filed within six (6) months from the denial of the Plaintiff's administrative claim, pursuant to 28 U.S.C. § 2401(b).

4

## THE UNITED STATES DEPARTMENT OF JUSTICE IS AN AGENCY OF THE UNITED STATES OF AMERICA

15. The Department of Justice is an agency of the United States of America. At all relevant times, Defendant United States of America (USA), through its agency, the Department of Justice, owned, operated and controlled the Butner Federal Correctional Complex, a federal prison in North Carolina for male inmates of all security levels who have special health needs. The Butner Federal Correctional Complex is located in Butner, North Carolina. Defendant USA, by and through its agency, the Department of Justice, staffed Butner FCC with it agents, servants and/ or employees, and said agents, servants and/ or employees rendered the medical care and treatment in question to Plaintiff Mr. Burgess. Butner FCC is a United States federal prison in North Carolina for male inmates of all security levels who have special health needs. Butner FCC is operated by the Federal Bureau of Prisons, a division of the United States Department of Justice, an agency of the Defendant, United States of America.

## EMPLOYMENT AND COURSE AND SCOPE OF EMPLOYMENT

16. At all relevant times, all relevant persons involved in the medical and health care services provided to Plaintiff Mr. Burgess at Butner FCC in Butner, North Carolina, were the agents, servants and/or employees of the Department of Justice, the United States of America, or some other agency thereof, and at all material times, were acting within the course and scope of their employment or agency.

## NORTH CAROLINA MEDICAL MALPRACTICE PREREQUISITES

17. At all the relevant times, Michael Valdez, MD (hereinafter "Dr. Valdez "), was, upon information and belief, a medical doctor licensed to practice medicine in the State of North Carolina. Upon information and belief, at all relevant times, Dr. Valdez was a resident of Durham, North Carolina. At all relevant times, Dr. Valdez practiced in the specialty of prison medicine and

5

worked as a staff physician at Butner FCC. Dr. Valdez was employed by Butner FCC, the Federal Bureau of Prisons and the United States Department of Justice, and was an employee and agent of Defendant USA. Dr. Valdez, at all times relevant to Plaintiff's Complaint, worked at Butner FCC and formed a doctor-patient relationship with Plaintiff Mr. Burgess, and was actively involved as the attending physician, and was one of the physicians tasked with primary responsibility for the Plaintiff Mr. Burgess' care during the course of his medical care received at Butner FCC from December 2018 through July 2019.

18.     In the alternative, and at all the relevant times, Michael Valdez, MD was, upon information and belief, a medical doctor licensed to practice medicine in the State of North Carolina. Upon information and belief, Dr. Valdez was a resident of Durham, North Carolina. At all relevant times, Dr. Valdez practiced in the specialty of prison medicine and worked as a staff physician at Butner FCC. Upon information and belief, Dr. Valdez was employed by the University of Massachusetts Medical School (UMASS) to provide medical care at Butner FCC. Upon information and belief, Dr. Valdez was an agent of Butner FCC, the Federal Bureau of Prisons and the United States Department of Justice, and was an employee and/or agent of Defendant USA, in the manner set forth in *Logue v. United States*, 412 U.S.521, 528, 37 L. Ed. 2d 121, 93 S. Ct. 2215 (1973). And *Robb v. United States*, 80 F.3d 844 (1996). The *Robb* Court's analysis relied upon the *Restatement (Second) of Agency,* § 220(2), in evaluating agency, including the following in distinguishing a servant from an independent contractor:

> (a) the extent of control which, by the agreement, the master may exercise
> over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to which, in the locality, of work is

6

usually done under the direction of the employer or a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) a method of payment, whether by the time or by the job;

(h) whether or not the work is part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principle is or is not in business.

Upon information and belief, it is anticipated that the evidence will show Dr. Valdez, at all times was employed by Butner FCC to provide medical care to prisoners - a part of the normal duties owed by Butner FCC to its inmates, that the bulk of the tools used by Dr. Valdez in his work were the property of Butner FCC, and that Dr. Valdez' hours and schedule were controlled by Butner FCC. It is also anticipated that, upon information and belief, Dr. Valdez was controlled by Butner FCC policy and procedure that limited his ability to 1) a choice of prescription drugs to formulary drugs and 2) the use of medical devices – which to rebut the physician would be required to undergo further requests to Butner FCC administration and specifically articulate reasons why a non-formulary medication or medical device was needed. This control by policy limited Dr. Valdez, required Dr. Valdez to undergo additional authorizations from administration, and effectively made it more difficult and cumbersome to obtain medically necessary care to patients, including Mr. Burgess.

7

Dr. Valdez, at all times relevant to Plaintiff's Complaint, worked at Butner FCC and formed a doctor-patient relationship with Plaintiff Mr. Burgess, and was actively involved as the attending physician, and was one of the physicians tasked with primary responsibility for the Plaintiff Mr. Burgess' care during the course of his medical care received at Butner FCC from December 2018 through July 2019.

19.     At all the relevant times, Jennifer Adkins, NP ("NP Adkins"), was, upon information and belief, a nurse practitioner, an advanced practice registered nurse. Upon information and belief, NP Adkins was a resident of Butner, North Carolina. At all relevant times, NP Adkins practiced in the specialty of prison medicine and worked at Butner FCC as a staff nurse practitioner, or otherwise a Mid-Level practitioner under the BOP policies as described herein. NP Adkins was employed by Butner FCC, the Federal Bureau of Prisons and the United States Department of Justice, and was an employee and agent of Defendant USA. NP Adkins, at all times relevant to Plaintiff's Complaint, worked at Butner FCC and formed the equivalent of a doctor-patient relationship with Plaintiff, and was actively involved as an attending Mid-Level practitioner, and was one of the mid-level practitioners tasked with primary responsibility for Mr. Burgess' care during the course of his medical care received at Butner FCC from December 2018 through July 2019.

20.     At all relevant times, Defendant USA was vicariously liable for the actions and/or omissions of Dr. Valdez and NP Adkins, the Butner Medical Director or equivalent, as well as the unnamed agents and employees of Butner FCC described herein, as these named and unnamed employees, agents or servants functioned with actual and/ or apparent authority as the employees or agents of Defendant USA acting within the scope of their employment or agency. Defendant

8

USA is therefore liable under *respondeat superior*, master-servant or agency for the acts or inactions of the agents and employees described herein.

21. At all relevant times, Defendant USA, by and through its agents, Dr. Valdez and NP Adkins, were healthcare providers as defined by N.C. Gen. Stat. § 90-21.11 and were healthcare providers to Plaintiff, Mr. Burgess. Dr. Valdez and NP Adkins were healthcare providers that formed the critical core of Mr. Burgess' Primary Care Provider Team (PCPT), as discussed further herein, and all were equally responsible for managing Mr. Burgess' health care needs.

22. This action alleges "medical malpractice" by "health care provider(s)" as defined in N.C. Gen. Stat. § 90-21.11 in failing to comply with the standards of care pursuant to N.C. Gen. Stat. § 90-21.12, and in failing to comply with the duties imposed by North Carolina common law. This action also alleges administrative negligence on the part of FCC Butner administration in their classification of Mr. Burgess and failure to properly place Mr. Burgess within Federal Medical Center Butner.

23. Pursuant to Rule 9(j) of the North Carolina Rules of Civil Procedure, the medical care which is the subject of this Complaint and all medical records pertaining to the alleged negligence that are available to the plaintiff after reasonable inquiry have been reviewed by a physician who Plaintiff reasonably believes and expects will qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence, who is currently in the active practice of prison medicine and is familiar with the applicable standard of care in Butner, North Carolina or similar communities. This medical care provider is willing to testify that the medical care complained of did not comply with the applicable standards of care.

24. Pursuant to Rule 9(j) of the North Carolina Rules of Civil Procedure, the medical care which is the subject of this Complaint and all medical records pertaining to the alleged negligence that are available to the plaintiff after reasonable inquiry have been reviewed by a Mid-level practitioner who Plaintiff reasonably believes and expects will qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence, who is currently in the active practice of prison medicine as a mid-level practitioner and is familiar with the applicable standard of care in Butner, North Carolina or similar communities. This medical care provider is willing to testify that the medical care complained of did not comply with the applicable standards of care.

25. Plaintiffs also contend that Defendant USA, by and through Butner FCC, Dr. Valdez and NP Adkins, failed to comply with the duties imposed by North Carolina common law in the course of providing medical care to the Plaintiff as described herein.

**PLAINTIFF'S CONSTITUTIONAL OBJECTIONS TO N.C.G.S. § 90-21.19, OR IN THE ALTERNATIVE, PLAINTIFF'S CLAIMS FALL UNDER AN EXCEPTION TO N.C.G.S. § 90-21.19**

26. Plaintiff objects to N.C.G.S. § 90-21.19 ("The Cap on Non-Economic Damages") as unconstitutional. The Cap On Non-Economic Damages denies medical malpractice plaintiffs, including Plaintiff in this action, the right to a jury trial, due process of law, equal protection under the law and the right to open courts, violates the separation of powers, and confers that exclusive emolument on healthcare providers, in violation of the United States and North Carolina Constitutions. The Cap on Non-Economic Damages violates the Seventh and Fourteenth Amendments of the United States Constitution and Article I, Sections 6, 18, 19, 25 and 32 and Article IV, Sections 1 and 13 of the North Carolina Constitution.

27. In the alternative, Plaintiff alleges and avers that the medical care rendered by Defendant USA, by and through Butner, Dr. Valdez and NP Adkins falls under an exception to

N.C.G.S. § 90-21.19 ("The Cap on Non-Economic Damages"), and Plaintiff is not subject to the cap on Non-Economic damages. Subsection (b) of N.C.G.S. § 90-21.19 creates an exception to the cap "if the trier of fact finds both of the following: (1) The plaintiff suffered disfigurement, loss of use of part of the body, permanent injury or death; and (2) The defendant's acts or failures, which are the proximate cause of the plaintiff's injuries, were committed in reckless disregard of the rights of others, grossly negligent, fraudulent, intentional or with malice." Plaintiff alleges and avers that he has suffered a loss of use of and permanent injury to his legs and permanent injury to his vasculature, and the defendant's acts or failures were the proximate cause of the plaintiff's injuries, and such acts or failures were grossly negligent, for the reasons set forth herein.

### MEDICAL BACKGROUND INFORMATION ON MR. BURGESS' MEDICAL CONDITION OF HYPERCOAGULABLE DISORDER OF UNKNOWN ETIOLOGY

28. In approximately 2002, Mr. Burgess developed multiple deep vein thrombosis (DVT), and subsequently developed multiple pulmonary embolism (PE) in his lungs. He was diagnosed with a condition which has since come to be described by his physicians as hypercoagulable blood disorder of unknown etiology. This condition is also often referred to as thrombophilia. A hypercoagulable disorder, or thrombophilia, is characterized by a person who has an abnormal blood trait that causes coagulation of the blood such that the person is at increased risk a blood clot formation within that person's blood vessels.

29. The most common conditions associated with thrombophilia, or a hypercoagulable disorder, are deep vein thrombosis (DVT) and pulmonary embolism (PE) which are commonly referred to collectively as venous thromboembolism (VTE). DVT medical condition that occurs when a blood clot forms in a deep vein. These clots usually develop in the lower leg, thigh, or pelvis, but they can also occur in the arm.

11

30. DVT may lead to long-term swelling and heaviness of the legs due to damage to valves within the veins. In addition, the DVT clot may also break off, migrate and then become a pulmonary embolism (PE), which is when a blood clot migrates, or embolizes to arteries within the lungs. Depending on the size and location of a pulmonary embolism, a PE may lead to sudden-onset shortness of breath, chest pain, palpations, and may be further complicated by collapse, shock, cardiac arrest and death.

31. Deep vein thrombosis sufferers may also develop a condition collectively referred to as post-thrombotic syndrome or post-phlebitic syndrome, whose symptoms can be painful and debilitating. Post-thrombotic syndrome is caused by the damaging of the small valves inside veins that work to ensure blood flows in the correct direction within the veins and does not flow backwards. The effect of clot formation in the veins can damage those valves, allowing the veins to become leaky, allowing blood to pool within the veins. Additionally, further complicating matters are DVTs that when healed, that impede or completely block blood flow from the veins back to the heart. The residual blood clot impedes blood flow, complicated by valve disfunction, which can lead to a number of debilitating symptoms such as: pain or aching within the affected body part, leg or arm swelling, heaviness, cramping, redness, skin discoloration or dark pigmentation, blueish fingers or toes, dry skin or eczema and varicose veins.

32. If a vein becomes completely occluded by a healed DVT, revascularization may occur – which is when smaller veins nearby enlarge to help move blood past the blockage. If these smaller veins enlarge enough, these symptoms are usually mild. However, for a group of such sufferers, the smaller veins that develop to help blood bypass a blockage do not get large enough to adequately drain all the blood that has pooled in the extremity. In such patients, the post-thrombotic syndrome symptoms are worse.

12

33. Further complications of post-thrombotic syndrome are that such patients can develop sores or ulcers on the affected extremity. Patients with post-thrombotic syndrome who develop sores or ulcers are generally at a greatly increased risk of chronic wounds that will not heal because such a patient has significantly impaired vascularization, which decreases the propensity of wound healing. Advanced post-thrombotic syndrome sores will result in tissue death requiring surgery to debride the damaged tissue. Severely advanced stages of post-thrombotic syndrome may require limb amputation.

34. The mainstay care for a person with a hypercoagulable disorder is the administration of anticoagulant medications to assist with the prevention of blood clots. In addition, patients with post-thrombotic syndrome, with the pooling of blood within their legs, are found to be medically benefitted by the use of leg compression sleeves, also referred to as sequential compression devices or leg pumps. These devices are generally applied to the legs or extremities to assist pooling blood in being pumped back through the venous system.

35. When Mr. Burgess first developed his medical problems with DVTs and PEs in 2002, he was treated in New York and Florida, and his treatment regimen included the medication Coumadin, an anticoagulant designed to thin his blood and prevent blood clots. Burgess failed Coumadin treatment. Thereafter, Mr. Burgess received a filter placed in his inferior vena cava (IVC Filter) to help decrease the risk of future clots migrating to his lungs. There are two *vena cava* in humans, the inferior vena cava (carrying blood from the lower body) and the superior vena cava (carrying blood from the head, arms, and upper body).

36. The IVC filter that was placed in Mr. Burgess is not used in current medical practice because this IVC Filter was initially designed for lifetime placement, meaning that it was not

13

designed to be replaced. Current medicine now allows for the placement of IVC Filters that allow replacement of the IVC Filter were it to become fully occluded by clotting.

37. Thereafter, Mr. Burgess' blood coagulation remained relatively stable until 2016 when he developed additional DVTs and PEs.

38. The 2016 clots developed by Mr. Burgess required his treatment at Wake Forest Baptist Hospital where he was treated by a team of vascular surgery, hematology and family medicine specialists who worked together to monitor Mr. Burgess' condition. The Wake Forest Baptist Hospital team of hematology, vascular surgery and family medicine worked with Burgess to manage his medical condition, finding in their work that a newer generation anticoagulation medication, Xarelto, was extremely effective in managing and preventing clot development for Mr. Burges. Xarelto had been found to be extremely effective with Mr. Burgess, and prior to Mr. Burgess' incarceration he had been clot free for over 18 months. Immediately prior to incarceration, Mr. Burgess' IVC Filter was stable with proper blood flow. The focus of the Wake Forest Baptist Hospital team was managing and stabilizing Burgess' chronic symptoms and to prevent further acute clotting.

39. Because of Mr. Burgess' prior DVTs, he had suffered chronic lower leg pain and swelling secondary to his previous clot formation and vascular damage, likely from post-thrombotic syndrome. To assist Mr. Burgess with these symptoms and to assist in preventing further clotting, pain, swelling; and to assist with blood flow, Mr. Burgess had been prescribed and had been using sequential leg compression devices (or leg pumps) to assist in return venous blood flow. The purpose of these leg compression devices was to force blood flow correctly through the veinous system and prevent blood pooling. Prior to incarceration, Mr. Burgess was using those leg compression devices for one-hour sessions, three to four times per day.

14

40.     Prior to his incarceration, Mr. Burgess had been found by his Wake Forest Baptist Health providers to be extremely compliant and engaged with his medical care, with a continued desire to improve his condition to the best of his ability.

**RELEVANT FEDERAL BUREAU OF PRISONS (BOP)**
**POLICIES AND PROCEDURES**

41.     The Federal Bureau of Prisons (BOP) promulgates policies and procedures mandated for all correctional facilities under their control. BOP policies and procedures are largely predicated on standards mandated by the American Correctional Association, and set forth in Standards for Adult Correctional Institutions, 4th Ed., Performance- Based Standards for Adult Local Detention Facilities, 4th Ed., and Standards for Administration of Correctional Agencies, 2nd Ed.

42.     All federal correctional facilities under the U.S. Department of Justice are mandated to maintain strict compliance with BOP policies and procedures. Butner Federal Correctional Complex (FCC Butner) was such a federal correctional facility.

43.     BOP Policy P6031.01 (1/15/2005), titled "Patient Care," sets forth its purpose as to "effectively deliver medically necessary health care to inmates." BOP Policy P6031.01 was amended by BOP Policy P6031.03 on August 23, 2013, but the policies discussed herein are contained in both versions of this policy. These policies set the minimal acceptable level of care in a Federal Bureau of Prisons correctional institution.

44.     BOP Policy P6031.01, Section 12.a., discusses the concept of patient management in a team approach, as follows:

> **Primary Care Provider Teams**. The PCPT is designed to improve health care services delivery by enhancing continuity of care and promoting preventive health care measures. The PCPT is designed to function in the same manner as a medical office in a community setting. **Under the PCPT model, each inmate is assigned to a**

15

**medical team of health care providers and support staff who are responsible for managing the inmate's health care needs**.

Assigning inmate caseloads to PCPTs will provide less duplication of services because team members will be more familiar with the medical problems of inmates assigned to the team….

For this model to be effective, teams are designed with support staff, such as nurses, medical assistants, health information technicians, and medical clerical staff, to perform duties and services which support the MLPs and physicians as they see their patients in the clinic. (emphasis added)

45.     BOP Policy P6031.01, Section 12.a.(1)(a-b), discusses the roles of the physician and Mid-Level Practitioners (MLP)(which include physician assistants), or PAs or PA-Cs), as follows:

(a) **Physician**. A physician will provide clinical oversight for multiple provider teams. The physician, as the licensed provider of the team, is responsible for the care that team delivers. As such, it is the physician's responsibility:
■ To consult with the other team members.
■ To provide training and mentoring.
■ To directly evaluate and treat severely ill and medically complex inmates.

While the MLP is the PCPT's primary care provider, physicians are also responsible for providing direct patient care. **Physicians will medically manage inmates with complex conditions on an ongoing basis notwithstanding the assignment of that inmate to an MLP.** (Refer to Section 15 for discussion of the physician's role and referral procedures for complex conditions).

(b) **Mid-level Practitioner (MLP)**. The MLP will serve as the primary point of contact for inmates assigned to their caseload. They will serve as the primary provider for:
■ Routine requests for evaluation of new complaints.
■ Ongoing management of reoccurring conditions.
■ Emergencies when clinically indicated. (emphasis added)

16

46.     BOP Policy P6031.01, Section 15, discusses the treatment of patients at prison "Chronic Care Clinics" and within that policy specifically discusses management of high-risk or medical complex patients, as follows:

> **High risk or medically complex chronic care inmates will be seen more frequently in accordance with good clinical judgment, in addition to or in conjunction with regular visits with their primary provider.**
>
> **All treatment and management decisions a physician or MLP make will be communicated to the inmate's assigned primary provider for continuity of care**.
>
> The CD or staff physician will:
>
> ■ Initially examine all new arrivals from other institutions that have a CCC assignment, within 14 days of arrival, to establish a treatment plan        and follow-up intervals appropriate for the inmate's medical needs.
> ■ Personally examine and approve all additions and deletions of inmates to a CCC.
>
> The CD retains overall professional responsibility for managing CCC inmates. The CD is expected to provide consultation to the MLPs as needed.
> (emphasis added)

47.     BOP Policy P6031.01, Section 17, captioned "Triage/ Access to Care" discusses how patients are evaluated to determine the need for care, level of care needed and the immediacy of any such medical need, referred to as "triage," as follows:

> Triage is defined as the classification of patients according to priority of need for examination and/or treatment. **Triage allows truly urgent conditions to be addressed adequately on the same day, while also allowing more routine conditions or concerns to be addressed at a scheduled appointment**. During triage the following will occur:
>
> ■ The inmate will provide a brief history.
> ■ Vital signs will be taken, if indicated.

17

■ An appointment will be scheduled with the appropriate provider within a time frame appropriate for the inmate's condition and medical needs...
(emphasis added)

48.     BOP Policy P6031.01, Section 7, captioned "Scope of Services – Categories of Care" discusses the different levels of care to inmates, how to categorize an inmate's complaints, and the level of response required by the PCPT, as follows:

**7. SCOPE OF SERVICES – CATEGORIES OF CARE**

The Bureau of Prisons provides five major levels of care that define care provided to inmates.…..

 a. **Medically Necessary – Acute or Emergent. Medical conditions that are of   an immediate, acute or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life-threatening**.

49.     Per BOP Policy P6031.01, Section 8, it should be noted that any condition determined to be "Medically Necessary – Acute or Emergent" does not require any "utilization review" for involving outside care providers, as immediate action is required.

**DISCRETIONARY FUNCTION CONSIDERATIONS**

50.     This action is premised upon medical negligence in the care and treatment of Mr. Burgess during his incarceration at Butner FCC. The medical care at issue involves the medical treatment/ or lack of treatment for Mr. Burgess' hypercoagulable blood disorder on unknown etiology, a condition which untreated or improperly treated would result a rapid deterioration of the inmate's health, a significant irreversible loss of function, or would be life-threatening.

51.     18 U.S.C. §4042 (a)(2) requires that BOP, through Butner FCC "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or

18

convicted of offenses against the United States, or held as witnesses or otherwise." Section 4042 defines the BOP's duty of care owed to Mr. Burgess as "the exercise of ordinary diligence to keep prisoners safe and free from harm." See also *Jones v United States*, 534 F.2nd 53, 54 (5th Cir. 1976). There is no body of law that would allow the BOP, through its agents to deny medical care to a prisoner, the lack of which would result in "rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life-threatening."

52.     In this action, a portion of Mr. Burgess' claims are in the failure by medical to provide him with leg sequential compression devices (SCDs) to treat his hypercoagulable blood disorder. The Butner staff as described herein could have either allowed Mr. Burgess to bring his own SCDs after inspecting them, or alternatively provided Mr. Burgess SCDs through the prison system, as the further recitation shows those medical devices were in use at FCC Butner. The gravamen of Mr. Burgess' allegations are that he was not given SCDs for use in treating his acute and emergent medical condition – not that he was denied the use of his own SCDs which he had brought with him to Butner after being advised to do so.

53.     As it pertains to this aspect of Mr. Burgess' claims, there is no support for any claim that this aspect of the Burgess' claims is barred by the discretionary function exception to the FTCA.

**MR. BURGESS BACKGROUND, ARREST
AND COURT PROCEDURES**

54.     Prior to Mr. Burgess' legal issues as described herein, Mr. Burgess was self-employed on contract basis with numerous corporate entities throughout the United States to consult in the area of Information Technology to include networking and infrastructure, software development, and program management for corporations of all sizes.  Mr. Burgess worked a full schedule continuously in the years prior to his arrest, between 40 and 60 hours a week during those

19

years. Additionally, Mr. Burgess continually worked to maintain his technical certifications, and to increase his level of expertise. In the two years before his arrest, Mr. Burgess spent considerable time obtaining his bachelor's degree in IT security, his MBA, and the highest levels of AGILE certification. Mr. Burgess' greatest benefit to his employers was his extensive knowledge in operations and multiple IT disciplines.

55.     Prior to Mr. Burgess' legal issues as described herein, Mr. Burgess was fully capable of driving a motor vehicle and airline travel to project sites, was fully capable of walking significant distances, and was capable of strenuous exercise. Mr. Burgess regularly exercised by lifting weights, walking and was able to engage in marital relations with his wife. Mr. Burgess enjoyed spending time with his wife Jill Burgess and family, and routinely spent time in recreational activities with his family, such as attending the annual fair, going to the beach and using the family motorboat, fishing and deep-sea fishing, and travelling to the mountains. In the month prior to reporting to Butner, Mr. Burgess' family went to Epcot Center in Florida where he spent two full days walking the Epcot Center facilities. Prior to his incarceration, Mr. Burgess was able to enjoy a healthy social and romantic relationship with his wife Jill Burgess.

56.     Mr. Burgess was charged in a federal indictment in the United States District Court for the Middle District of North Carolina, Docket 1:17 CR 450-1, involving a conspiracy to distribute anabolic steroids and transferring funds outside the United States.  Mr. Burgess pleaded guilty of one count of each of these charges.  As a part of Burgess' guilty plea, he went through several sentencing hearings with the Honorable Judge Carlton Tilley, Jr. in the United States District Court for the Middle District of North Carolina.

57.     Mr. Burgess' vascular specialist from Wake Forest Baptist Health wrote two letters to the Court outlining Burgess' medical condition to the Court and an overview of his care and

20

medical needs. This vascular specialist, Dr. Gabriella A. Velazquez-Ramirez, was a Wake Forest Baptist Health ("Wake Forest") provider who had been providing Burgess care for an extended period of time, and who described Burgess' primary medical problem as suffering from a hypercoagulable disorder of unknown etiology. Dr. Velazquez-Ramirez described Mr. Burgess' condition as one where his body forms blood clots more rapidly than the average person. Specific to Mr. Burgess, Dr. Velazquez-Ramirez described that general anticoagulation was needed as the mainstay form of treatment for this condition. Dr. Velazquez-Ramirez described Mr. Burgess had been previously admitted to the hospital for DVT (deep vein thrombosis) which are blood clots in the extremities, and Mr. Burgess had suffered DVTs in both legs on several occasions.

58. In addition, Dr. Velazquez-Ramirez described Mr. Burgess as having suffered a history of multiple pulmonary emboli (PE) – which are blood clots in the lungs. This had occurred early during the care by Dr. Velazquez-Ramirez, who described Mr. Burgess' case as that which required collaboration from Mr. Burgess' primary care physician, hematology, and vascular surgeon. Initially, as described by Dr. Velazquez-Ramirez, Mr. Burgess was unresponsive to various medications and as a result had a IVC filter placed in the *inferior vena cava* – which is a large vein carrying deoxygenated blood into the heart.

59. Dr. Velazquez-Ramirez described that the IVC filter was placed to filter out DVT travelling from the lower extremities in order to reduce the risk of future pulmonary emboli events. The specific IVC filter placed was one for a life-long design, which is not currently in use. Current IVC filters are designed now to be replaced periodically. As a result of this specific IVC filter in place with Mr. Burgess, Dr. Velazquez-Ramirez described that there are serious morbidity risks if it were attempted to be removed and replaced with a more modern version.

21

60.      At the time Dr. Velazquez-Ramirez wrote her letter on June 18, 2018, Burgess had undergone a recent scan which determined that the IVC filter had not moved and that blood clotting on the outflow of the filter had stabilized.  The scans also confirmed that Burgess had sustained chronic vascular damage in both legs which contributed to constant swelling and ongoing pain in the legs, also working to prevent normal return blood flow to the heart and lungs.  This was described as a form of venous stasis. Dr. Velazquez-Ramirez  had diagnosed Mr.. Burgess as having chronic bilateral leg pain as a result of post-thrombotic syndrome, which is frequently seen in patients suffering from clotting of the veins in lower extremities.

61.      Dr. Velazquez-Ramirez continued to note that there were limited medications to treat this condition, and that a number had been attempted. The medication to which Burgess was most responsive had been Xarelto.  Dr. Velazquez-Ramirez expressed very clearly that Burgess was most responsive to Xarelto when the other medications had failed.  Additionally, Dr. Velazquez-Ramirez explained that Burgess had been prescribed a medical device that assisted with circulation in the legs.  These were described as sleeves placed over the legs, in which air is pumped through to force blood through the blood vessels.  Dr. Velazquez-Ramirez indicated that those sleeves were to be used for one hour, four times a day by Burgess.  Dr. Velazquez-Ramirez explained that this greatly improved his overall health and seemed to stabilize Burgess from the very serious condition.

62.      Dr. Velazquez-Ramirez's report indicated that if Burgess were to go to prison, that he would need to be monitored by a team familiar with his hypercoagulable disorder who would need to be able to respond quickly to meet any further issues that may arise.  Dr. Velazquez-Ramirez emphasized that Burgess would need those accommodations while he was in prison.  Dr. Velazquez-Ramirez noted that not having Burgess close to his specialized physicians could pose

22

a risk regarding early identification of acute issues, potentially delaying treatment, and thus, resulting in a worsening condition.

63. Dr. Velazquez-Ramirez indicated in her letter to the Court that Mr. Burgess had been "extremely compliant and engaged with his care and has a continued desire to improve his condition . . ."

64. Also presented to Judge Tilley at that September 9, 2018 hearing were two letters from Dr. Alicia Walters, a family medicine physician at Wake Forest Baptist Hospital who described being Burgess' primary care physician for the past four years. Dr. Walters also described Burgess' hypercoagulative disorder of unknown etiology. Similarly, Dr. Walters described Burgess' prior treatment and pharmacological attempts at correction. Dr. Walters also described Burgess' suffering from chronic lower leg pain and swelling secondary to chronic clot formation and vascular damage, outlining Burgess' IVC filter and his risk for future clots. Dr. Walters relayed that Burgess had become more stable but only because of the close interactions of his medical team. Dr. Walters described Burgess as extremely compliant and engaged with his medical care, with a continued desire to improve his condition to the best of his ability. Dr. Walters described her serious concerns about breaking with the continuity of his multi-disciplinary team of providers at Wake Forest Baptist Health, potentially leading to a worsening of his chronic conditions. Dr. Walters expressed that Burgess would need to be followed closely by a medical team well established and familiar with his case and care. Dr. Walters emphasized that Burgess' case was a unique case with multiple complexities and had a potential for negative outcomes if the care team were not familiar with his specific case and if they did respond quickly to any acute condition.

65. At a hearing before Judge Tilley in the United States District Court for the Middle District of North Carolina on September 6, 2018, the Burgess' medical issues were discussed, and the Court acknowledged receiving letters from Dr. Walters and Dr. Velazquez-Ramirez. The Court acknowledged receiving evidence of Burgess' hypercoagulative disorder requiring the use of specialized compression leg sleeves with pumps to promote circulation which were needed to be applied three to four times daily. It appears that the Court made inquiries as to whether or not the leg sleeves could be accommodated by BOP, and it appears that Judge Tilley indicated he would impose a variant sentence of 18 months if medical facilities within the Bureau of Prisons could accommodate Burgess' treatment. Present at that time within the Court was Ms. Beige-Tapp, a U.S. Probation Officer, who was requested by the Court to determine whether there was a facility within the Bureau of Prisons that would allow Burgess to continue to utilize his compression sleeves and pump while in custody. The sentencing hearing was recessed to allow that inquiry.

66. In email dated June 7, 2018 from Beige-Tapp, U.S. Probation Officer to a DOJ official and Mr. Burgess' attorney Jimmy Quander, Officer Beige Tapp indicated that she called the Federal Medical Center at Butner and spoke with Jan Brinkley (919-575-3900 – Ext. 5238). Ms. Tapp wrote that she had explained Burgess' condition and requirements to have his compression sleeves and pumps for use three to four times daily and that Ms. Brinkley had indicated that Butner had the equipment available but since Burgess had his own equipment at home, he would be allowed to bring the equipment with him and do the "same thing at Butner that he did at home." Ms. Brinkley reportedly indicated that they "treat things much worse than this" and they would be able to accommodate him.

24

67.     On October 28, 2018, the Burgess sentencing hearing was re-convened before Judge Tilley in the United States District Court for the Middle District of North Carolina.  The Court acknowledged receiving assurances from Ms. Beige-Tapp of the U.S. Probation Office that the Federal Medical Center at Butner could accommodate Burgess' compression sleeves/pump treatment requirements.  The Court then imposed its sentence of 18 months at Butner Federal Prison, followed by three years of supervised release and a fine of $1,000 and a $200 special assessment.  At this hearing, Judge Tilley also made the following recommendation on the record:

> **It is recommended to the federal Bureau of Prisons that Mr. Burgess be designated for a medical facility, specifically at the Butner facility, where the Court is informed through the Bureau of Prisons that Mr. Burgess' specific medical condition can be accommodated.  It is recommended that the accommodation be allowed, that the medical records, if any, which had not already been provided to the Bureau of Prisons be provided, and that Mr. Burgess be given whatever other medical attention may be appropriate.**
> (emphasis added)

68.     Prior to his self-surrender date on December 4, 2018, Burgess was followed by his family practice physician, Dr. Alicia Walters at Wake Forest Baptist Health.  At that time Burgess' medical records show that his medical history included chronic anticoagulation, chronic venous insufficiency, chronic back pain, recurrent DVT and pulmonary embolism, degenerative joint disease and osteoarthritis, vertigo and vestibular migraine, hyperlipidemia, obstructive sleep apnea, attention deficit disorder, Vitamin D deficiency, RUQ abdominal pain and anxiety/depression.  His current home medications included the following:  Xarelto, Valium, Antivert, Niacin, Lipitor, Baclofen, Gabapentin and Kenalog cream.  Dr. Walters noted in this report, in relation to the home meds, that she really felt patient would benefit from Xarelto use over other anticoagulation long-term as Burgess has previously failed Coumadin.  Treatments listed by Dr. Walters were automatic pump with lower extremity compression sleeves, three to

25

four times a day for one hour.  An abdominal ultrasound performed on December 6, 2018 showed Burgess' vena cava was patent.

### GREG BURGESS MEDICAL CARE AT BUTNER

69.     On December 13, 2018, on his way to Butner FCC, Burgess made a call to Butner FCC at 0959 hours (telephone number 919.575.5000), prior to his arriving at Butner that day. During that telephone call, Mr. Burgess was advised that he could bring medications into Butner, but he was not going to be allowed to bring his leg compression sleeves in with him into Butner.

70.     After the call to Butner, Mr. Burgess then stopped while in route to Butner at a CVS Pharmacy and had all his medications filled, and those medications were in the CVS Pharmacy bags, were unopened and were with him when he reported to Butner FCC.

71.     On December 13, 2018 at 1155 hours, Mr. Burgess self-surrendered at LSC 1 Butner, as directed. When Burgess arrived at Butner on December 13, 2018, he came with his leg compression sleeves and a complete bag of his medications.  Upon his arrival, Mr. Burgess went through security and was brought to a processing area.  He brought his medications with him into Butner, but had left his leg compression sleeves in the car because of the bulk, and after being informed on the phone while in route that he would not be able to bring those compression sleeves into Butner with him.  Upon information and belief, the officer performing the intake was an Officer Bromberg.  Mr. Burgess informed Officer Bromberg that his leg compression sleeves were in the car, and by Court Order, he had been allowed to have those leg compression sleeves with him when he presented to Butner.  Officer Bromberg advised Mr. Burgess that he was the person that Mr. Burgess had spoken to on the phone and that the leg compression sleeves would not be allowed in the compound.  Officer Bromberg instructed Burgess to speak to medical about the leg compression sleeves.

26

72. In going through his initial intake with Officer Bromberg, Officer Bromberg took Mr. Burgess' medications, indicating that he would pass the medications to medical.

73. At Butner, Mr. Burgess' medical intake was performed by Kenneth Lane, EMT-P on December 13, 2018 from 1302 to 1310 hours. The physical exam was within normal limits except for bilateral leg pain and anxiety/depression. Home medications charted by the provider included Prazosin, Xarelto, Zofran, Gabapentin, Trazodone, Temazepam, Prozac, Xanax, and aspirin. Allergies noted at that time noted sulfur antibiotics which caused rash and Demerol which caused angioedema.

74. On December 13, 2018 a Medical Admission Medication List was prepared by Jennifer Adkins, NP at 1347 hours. The Medical Admission Medication List include the following: Zofran (4 mg q 8 h x 7 days), Temazepam (15 mg Q HS), Gabapentin (Neurontin) (300 mg 2 x daily), Alprazolam (Xanax) (0.5 mg q PM), aspirin (81 mg daily), Atorvastatin (20 mg daily) and Xarelto (20 mg daily). There is no record, by way of Medication Administration Record (MAR) or otherwise, evidencing that Burgess was given any of his home medications, including anticoagulation, until medication orders were entered on December 19, 2018.

75. As part of the Medical Admission Health Problems List, Jennifer Adkins, NP included the following medical health problems which were all listed as active: pulmonary embolism/DVT, hyperlipidemia, low back pain, vertigo, obesity, dermatitis, osteoarthritis – hip, depression/PTSD, and pain – low back, leg, abdomen.

76. That night on December 13, 2018, after going through intake, Mr. Burgess went to medical, explaining that he had just arrived at Butner and had brought his medications with him. One of the clerks or nurses then checked in medical and found his medications, and the medical staff gave Burgess his Xarelto that first night. The second night in Butner FCC, Burgess returned

27

to medical, and was instructed that he would not be able to continue his own medications and he would have to wait for the pharmacy to send in his prescriptions. Mr. Burgess went without receiving any anticoagulation medication from December 14, 2018 through December 19, 2018. Mr. Burgess received his first dose of a new anticoagulant, Eliquis, on December 19, 2018.

77. On December 19, 2018, Burgess underwent an Admission Medical Screening performed by Jennifer Adkins, NP[1]. This screening was performed ostensibly for risks associated with hypertension, lipid disorders, colon cancer, diabetes, aspirin for CVD risks, abdominal aneurysm, hearing, substance abuse, smoking, diet and exercise, infectious disease, and vision. Within this note, NP Adkins charted Inmate reports he was on Xarelto prior to incarceration for history of pulmonary embolism. NP Adkins also charts Burgess' history of smoking .3 packs per day for 12 years, history of eczema to elbows, history of migraine headaches, kidney stones, gait abnormality due to hip pain and history of Legg-Calve-Perthes Disease, permanent Greenfield IVC filter and that Burgess denied a history of hepatitis, measles, mumps, Rubella, smallpox, and Varicella. NP Adkins also charted that Burgess reported a history of pulmonary embolism x 9, DVT in right leg x 2, DVT in left leg x 3 but this condition was previously treated with Xarelto. NP Adkins charts Burgess reporting trying Coumadin and Lovenox in the past but was "unable to main therapeutic range." The Plan of Care prepared by NP Adkins included the following:

1. Hypolipidemia – Rx for Atorvastatin and aspirin daily and recheck labs in 6 months.
2. Hx of DVT/PE – Rx Eliquis 5 mg 2 x day. **Inmate will report bilateral leg swelling. Issue TED hose.** [NP Adkins here changes Burgess from Xarelto to Eliquis for his DVT/PE management – contrary to his history.]
3. Osteoarthritis – Rx Mobic 15 daily.
4. Headache – Rx Meclizine 30 pills per year for prn use. RX for Ibuprofen. Inmate to report to medical for evaluation and possible treatment with Zofran for any nausea/vomiting.

---

[1] It should be noted that Jennifer Adkins, NP is referenced to as NP, FNP and PA at various times in the Butner medical chart. For consistency and ease of reference throughout she is referenced to as Jennifer Adkins, NP or NP Adkins.

5. Depression/anxiety – Rx for Prozac, Prazosin and Trazadone. Following up with psych NP.
6. Obesity – dietary counseling.
7. Vision – optometry consult.

78. In addition to what is contained in the Butner medical chart about the December 19, 2018 NP Adkins encounter, Mr. Burgess answered general health questions as well as he could regarding his medications. When Mr. Burgess was told by NP Adkins that Xarelto, Zofran, Temazepam and Gabapentin would be discontinued, Mr. Burgess asked why the Xarelto was being discontinued and NP Adkins indicated that Eliquis would be "better for [him]." Mr. Burgess informed NP Adkins that his doctors on the outside had specifically put him on Xarelto for his condition and if she would check his records, she would see why. Mr. Burgess was instructed by NP Adkins that she did not review the medical records and did not have access to them. NP Adkins asked Mr. Burgess why his doctors preferred Xarelto, and Mr. Burgess explained that it was because of his hypercoagulative condition of an unknown etiology and NP Adkins' response was "Xarelto is non-formulary in the BOP." NP Adkins also gave reasons why the other medications were disallowed. Mr. Burgess also questioned NP Adkins as to his leg pumps that he had been prescribed on the outside could not be at Butner, and tried to explain that the Court had cleared his usage of this medically necessary equipment with medical at Butner prior to his sentencing and that he had an email to that effect. NP Adkins responded that this equipment was "not allowed at this facility."

79. Burgess received his first Eliquis 5 mg pill at the Pill Line window on December 19, 2018 at 1930 hours. That day, the medical chart reflects an entry under Health Alerts by Rafael Vega at 1938 hours that **"patient reports he was on Xarelto treatment before incarceration for history of pulmonary embolism."**

29

80. On December 19, 2018, there is an administrative note of Michael Valdez, MD charting that the inmate was seen and examined by NP Adkins where care was discussed, and a care plan formulated. Assessment was hyperlipidemia, DVT/PE due to unknown blood disorder, osteoarthritis, headache, depression/anxiety. Medications: continue statin, anticoagulation, Mobic, and Meclizine.

81. On December 20, 2018, J. Roberts, HIT, in medical records, charts that there was a radiology report scanned into document manager, with a note to please review.

82. On December 28, 2018, a behavioral health consult was performed by Matthew Padgett, APRM where Mr. Burgess denied suicide attempts and inpatient admissions, denied binging and purging, denied OCD symptoms, denied military service, denied psychotic symptoms and delusions, but reported a history of PTSD. Mr. Burgess admitted several head injuries from boxing and playing football, but his attention and focus were well maintained. Mr. Burgess reported a significant history of major depression and takes Prozac 80 mg daily. Overall Burgess' mood was stable. Psychological exam performed at that time was normal or appropriate in all categories in mental and emotional functioning. Social history taken was of two children and that Mr. Burgess had a master's degree in Cyber Security and was employed in IT. Mr. Burgess reported using THC in 2018 and anabolic injectable steroids with HGH abuse. Mr. Burgess was reported as a social drinker. The assessment of Matthew Padgett, APRM was of major depressive disorder and PTSD.

83. The Butner medical chart reflects Mr. Burgess was seen on December 28, 2018 by Neil Fulcher, NRP for **aching right hip, pain level rated as 5/10**.

84. On January 3, 2019 Mr. Burgess reported to sick call and was seen by Jennifer Adkins, NP with complaints that "**my hips have been hurting at night** and that rash on the inside

30

of my elbows has gotten worse." **Exam charted by NP Adkins was for bilateral hip pain that has increased since his incarceration**. NP Adkins refers to Mr. Burgess' history of Legg-Calve-Perthes Disease with ORIF of his right hip at age 14. NP Adkins rated Mr. Burgess' pain as 5/10, which increased with pressure. Mr. Burgess is charted to have reported improvement in discomfort since the initiation of Mobic. NP Adkins also charted a dermatological issue of eczema. The plan of NP Adkins included continuing Mobic for the hip pain and allowing two extra pillows for positioning, with instructions to lose weight and to continue his walking regime. The patient was instructed to "sick call" if his conditions worsen.

85. On January 22, 2019, Mr. Burgess wrote an email to his wife, Jill Burgess, requesting that she forward him the Beige-Tapp email outlining that he would be able to use his compression sleeves at Butner. On the same date, Jill Burgess forwarded to Mr. Burgess at Butner a copy of the original email from Beige-Tapp outlining her conversations with Jill Brinkley at Federal Medical Center Butner, indicating that he would be authorized to use his compression sleeves for three to four times daily.

86. The Butner medical chart documents that Mr. Burgess was seen by Pamela Harvey, RN on January 24, 2019 where his chief complaint was bilateral leg pain. Mr. Burgess is quoted as saying **"I am having leg pain related to my clot disorder. I used to use a circulation pump three times a day but I can't use it here."** Vitals taken at that time were 127/77-71-98.9. **Exam records show that the inmate complained of throbbing pain in his abdomen and legs**. Mr. Burgess at the exam rated his pain as a 6/10. Mr. Burgess reported that his problems had been **present for one-two weeks and is now worse. Burgess was reported as saying that he has had pain for ten years due to a history of pulmonary embolism and DVTs**. The chart note reflects that Mr. Burgess takes Eliquis two times a day. Nurse Harvey charts that Mr. Burgess was working

31

in UNICOR. **Nurse Harvey notes that Mr. Burgess wanted to work but thinks the sitting is aggravating his symptoms. Nurse Harvey charted that today he ambulates into medical with unsteady gait which is reportedly due to his pain and weakness**. Nurse Harvey's plan included placing Mr. Burgess on medical idle x 6 days given his prolonged sitting on the job until "sick call" appointment with provider.

87. A February 1, 2019 chart note from NP Adkins reflects Mr. Burgess was seen at 1000 hours with the chief complaint that **"they told me I could bring my SCD [sequential compression device] with me when I reported and it really helps my leg pain." NP Adkins' chart note reflects inmate seen for complaint of increased bilateral thigh and pelvic pain x 3-4 weeks. Previously treated with sequential compression device, rates his pain at 6/10. Describes his pain as throbbing. Reports his muscles ache. His pain is increased with prolonged sitting, walking, and climbing stairs**. Reports "moving around" and resting in bed improves his symptoms. Does wear TED hose. No pitting edema, extremity coolness, atrophic changes. No calf tenderness, rubor, pallor or toe ulcerations. Charted as having normal capillary refill and normal DP and PT pulses. Does not use OTC Tylenol/NASIDS. Currently working in UNICOR. **NP Adkins' assessment included unspecific leg pain in the bilateral thighs.** The plan of NP Adkins was two pair extra-large regular thigh high TED hose ordered. May use OTC Tylenol for discomfort. To return to "sick call" if there is no improvement in his pain. **There is a corresponding order of  two pair of extra-large thigh high TED hose entered in the prison record under Health Supplies, by Yvonne Lane, RN on the same date.**

88. Outside of what appears in the February 1, 2019 chart note, Mr. Burgess explained to NP Adkins that he was **having continuous pain and swelling of his legs/hip areas**, and that his compression device is what he used on the outside to alleviate these symptoms. Mr. Burgess

32

then showed NP Adkins the email from Butner medical staff to the Court concerning the use of his compression sleeves and pump. NP Adkins first informed Mr. Burgess that he could not have the equipment, but then attempted to call a "Mrs. Jacobs." However, Mrs. Jacobs did not answer her phone.

89.    Upon information and belief, on or about February 16, 2019, after leaving visitation and while returning to his housing unit, the pain in Mr. Burgess' pelvic area became unbearable. While in route to his unit, a correction officer noticed that Burgess was stopping every few steps to catch his breath and rest his legs. This officer followed Mr. Burgess upstairs to his unit (Durham A), and upon reaching the top of the stairs Burgess collapsed and lowered himself to the floor. The Unit Officer on duty, Officer Walker, approached and asked if there was a need to contact medical, which was done. Mr. Layne then showed up from medical and asked Mr. Burgess what was wrong, and **Mr. Burgess told him that his legs and lower back were "on fire."** Mr. Layne asked why Mr. Burgess was lying on the ground and Mr. Burgess informed him that he nearly blacked out trying to climb the stairs and he had lost his breath and was trying to recuperate. Mr. Layne then commented in front of both correctional officers and in addressing him said "Medical should only be called if [Mr. Burgess] had a broken back and since [Mr. Burgess'] feet were moving, [Mr. Burgess] should make his way back to his bunk, find a position of comfort and report to sick call on Tuesday morning." Mr. Burgess slowly regained his balance using the banister and handrail and walls which he used to make his way inside and back to his bunk to lie down.

90.    **On February 16, 2019, a chart entry under Health Supplies, notes that a wheelchair was provided to inmate Mr. Burgess**. This chart entry was made by Yvonne Lane, RN. There is no indication as to who placed this wheelchair order or the medical reasoning for this order.

33

91.     In an email from Jill Burgess to Beige-Tapp, the U.S. Probation Officer, dated February 18, 2019, Ms. Burgess reached out to Beige-Tapp telling her what had transpired with Mr. Burgess.  Essentially Jill Burgess described that everything the BOP stated would be available to Mr. Burgess was incorrect.  Jill Burgess described to Beige-Tapp that BOP did not allow Mr. Burgess to bring his leg sleeves as they stated they would, and had also changed his blood thinner medication.  Jill Burgess described to Beige-Tapp how she had visited her husband the previous day and he could barely walk.  In this email, Jill Burgess sought assistance from U.S. Probation Officer Beige-Tapp in helping in any way possible or asking that she discuss with Judge Tilley what could be done.

92.     On February 19, 2019 at 0857 hours there is a BOP Administrative Note of Michael Valdez, M.D. where **Mr. Burgess complained of his leg swelling getting worse, and that this is not new but since being in prison is getting worse these past few days.**  Additionally, it is charted that Mr. Burgess had stated while walking he "tweaked" his back.  Vitals taken at that time were 104/83-98-18-100% RA and 111/87-01-18-97.3.  The History section of his chart note reflects that **Dr. Valdez reported that in chart review it appears that neither of these issues is new and that Mr. Burgess was on appropriate treatment for his DVT/PE, on anticoagulant.** He reported that no other acute systemic complaints were present.  It was **reported by Dr. Valdez that Mr. Burgess described his pain as throbbing and rates his pain at 6/10**.  Mr. Burgess described his **pain in multiple locations, and he reports that it was been worse for one – two weeks**.  Dr. Valdez charts that Mr. Burgess was able to ambulate, but he presented in a wheelchair today.  Valdez charts **trace edema and some discoloration of his left extremity which he felt to be "likely chronic in nature."**  Dr. Valdez found no signs of infection.  Mr. Burgess' EKG was read with normal sinus rhythm.  **Dr. Valdez's assessment was of "unspecified leg pain."** It was

34

charted by Dr. Valdez that it is unclear why Mr. Burgess was in a wheelchair as apparently, he could walk. Dr. Valdez charted, again noting that Mr. Burgess has a history of DVT/PE and on anticoagulant already. Valdez charted Mr. Burgess as having "**really very unimpressive leg swelling and trace at best but may be attributable to venous stasis**."[2] Dr. Valdez reported that Mr. Burgess' history of DVT/PE may also be playing a part of his leg coloring. Dr. Valdez noted that either way, he would treat with low dose diuretic for symptom improvement. Dr. Valdez also prescribed Lasix for three days and counseled on safety while walking. Dr. Valdez also recommended leg elevation and compression stockings as had previously been provided.

93. Outside of what appears in the February 19, 2019 Butner chart note, Mr. Burgess reported that day to medical as requested by Mr. Layne, and Mr. Burgess had to be transported by wheelchair due to the pain he was experiencing. Mr. Burgess first reported his pain and the events of February 16th to a Nurse Gill, and then was seen by Dr. Valdez who was unimpressed with the swelling in his legs or the dark purple coloring of his legs and abdomen. Mr. Burgess tried to explain his hypercoagulative condition to Dr. Valdez, but Dr. Valdez wanted to hear nothing of it. Mr. Burgess asked if Dr. Valdez had either seen his PSR or any of his medical records from the outside - to which Dr. Valdez responded that he had not seen either of them. **Mr. Burgess pleaded with Dr. Valdez to perform a scan for his legs for clots and Dr. Valdez replied to "come back in a week**." Mr. Burgess was returned to the housing unit via wheelchair but needed assistance in climbing the stairs to his housing unit in Durham A, which further increased his pain level.

94. When arriving at the top of the stairs, Mr. Burgess encountered his counselor, Ms. Tyson, asking her if she would pull his PSR for medical to review because he felt that medical was

---

[2] Venous stasis is a medical condition where blood in leg veins slows down or pools preventing a return of de-oxygenated blood to the lungs and heart. There are a number of etiologies of venous stasis– but one etiology is blood clots.

35

not taking his situation seriously. Ms. Tyson indicated that she did not have access to the PSR. After arriving back in his unit, Mr. Burgess got assistance to the computer room to send an email to his wife. On his way back to his cell, Mr. Burgess, upon information and belief, passed out. Upon awakening, with assistance from other inmates, Mr. Burgess was returned to his cell to lie down. **After lying down, he noticed his legs had become swollen to the point they were constricted by his pants**. Mr. Burgess described removing his pants to alleviate the swelling and pain, also removing his compression socks. At that time, his cellmate, Rob Aycock, and another inmate noticed the amount of swelling and purplish coloring in his legs and went to alert Ms. Tyson. Ms. Tyson showed up, and later Lt. Andrews, and Mr. Burgess showed Ms. Tyson the email copy of the approval of his compression sleeves/pumps by the Butner medical staff to the Court. After inquiring about why his thigh high stockings that were off, Ms. Tyson advised Mr. Burgess to return to medical which he did.

95.     BOP Butner records of February 19, 2019 at 1219 hours describe a sick call visit with Teri Perkinson, EMT-P. The complaint contained in this sick call record is that Mr. Burgess described that "I am in so much pain I'm about to pass out and I'm trying not to throw up." And "I do not want pain pills." The chart note reflects that the inmate complains of pain on a 10/10 scale in his legs from his hips to his toes. The chart note reflects that Mr. Burgess describing the pain as aching and unbearable. The chart note reflects that Mr. Burgess was seen by his physician in the morning but did not mention pain to him and referred to complaints of a back injury in the past but was vague about injury information. The chart note reflected that Mr. Burgess had a full range of motion and normal pulses. The assessment of EMT-P Perkinson was that the inmate did not present with any acute findings that indicated immediate treatment was needed, and Mr. Burgess was advised to follow up with sick call.

36

96.     In addition to what appears in the February 19, 2019 Perkinson note, Mr. Burgess' reported back to medical and explained to Nurse Perkinson all that had transpired, and that someone needed to take his clotting issue seriously. Initially an attempt was made to take Mr. Burgess' blood pressure by Nurse Perkinson and another nurse, and Nurse Harvey explained "Oh, that's too high." A second blood pressure exam was taken, and Nurse Perkinson commented "That's much better." Mr. Burgess was informed by Nurse Perkinson that he would be placed on the Call Out Sheet and not to return to medical until then, adding "You need to stay in your provider's face to get the necessary medical attention you need." **Mr. Burgess was then returned to his unit via a wheelchair with assistance and upon arrival at the Durham A housing unit, he was moved to a ground floor unit (Vance A) which was a handicapped, wheelchair accessible unit**.

97.     On February 19, 2019 at 0951 hours, Jill Burgess emailed her husband, Mr. Burgess, asking how the pain in his back was. She also advised that she hoped to hear back from Beige-Tapp. **Mr. Burgess emailed back his wife on February 19, 2019 at 1139 hours describing his legs' swelling was as bad as ever and purple, additionally having back pain**. He described going to medical that morning and the physician wanted to put him on Lasix for water retention. Mr. Burgess described in the email trying to explain to the physician of his pre-existing condition, but the physician wanted nothing of it and dismissed him. Mr. Burgess described that he pleaded with Dr. Valdez to scan his legs for clots and was told to come back in a week. Mr. Burgess described in this email that he honestly believed that he would die at Butner at the hands of these people, and that their actions defied all common sense.

98.     Dr. Valdez, after apparently reviewing the chart note of EMT Perkinson, noted in an administrative chart note on February 19, 2019 at 1232 hours that the paramedic note was

37

appreciated, and the inmate with back pain that was not new. **Dr. Valdez described nothing traumatic or functionally emergent reported**. Dr. Valdez also charted that in the wheelchair that morning, Burgess was rolling himself around using both legs with flexion and extension of both hips and knees – which is something that would not normally be accomplished with a compromised spine.

99. On February 19, 2019 at 1300 hours, Jill Burgess wrote an email again to Beige-Tapp, the U.S. Probation Officer in which **she described Burgess going to see the doctor because his leg is swollen and purple and begging them to do a scan for clots, describing that medical would not**. Jill Burgess further described that the BOP does not even have Mr. Burgess' PR Report, so they have nothing to see the history of his clots. Jill Burgess described not wanting to see her husband die in prison and asked for any assistance from the Judge or otherwise to assist with her husband deteriorating in front of her, again expressing concern that Mr. Burgess would not make it out alive. Beige-Tapp emailed Jill Burgess again on February 19, 2019 at 1507 hours, asking for information about the identity and telephone number of Mr. Burgess' case manager, describing that she could not get anyone to answer on the main line, also describing that she had a left a message for the senior staff physician.

100. Jill. Burgess emailed Beige-Tapp again on February 19, 2019 at 1541 hours, indicating that she believed Ms. Howell was his Case Manager. She then described how medical had taken Mr. Burgess of his meds completely. Jill Burgess described how her husband had been placed in a wheelchair because his legs were so swollen and are purple, that he could not walk, but that medical would not order a scan for his legs. Jill Burgess described that her husband had suffered enough clots to know the condition. Jill Burgess described that this was exactly the fear

his physicians had expressed about Mr. Burgess going to Butner, again expressing concern that this condition could end his life.

101. On February 19, 2019 at 1559 hours, Beige-Tapp emailed Jill Burgess advising that she had spoken to the FCI medical person that she had talked with before sentencing and that that person was going to look into it. That person had reviewed Mr. Burgess' file and had verified the medications with her and assured Ms. Tapp that the medication that was substituted for the Xarelto was the same drug with less side effects. Ms. Tapp advised that person was going to contact the Clinical Director at FCI at Butner and she would have a call back shortly.

102. On February 19, 2019 at 1751 hours, Jill. Burgess emailed Mr. Burgess advising that they Butner medical had reviewed his file and verified the medications were correct and that the medication substituted for Xarelto is the same drug with less side effects.

103. A further email was sent by Jill Burgess to Ms. Beige-Tapp on February 19, 2019 at 1926 hours again describing her concern about the use of the substituted mediation for Xarelto – which was the proven medication per all Mr. Burgess' vascular physicians, and that it was pretty evident that Mr. Burgess has clots again. There was further writing in this email about what needed to be done to address Mr. Burgess' clots at this point. Again, Jill Burgess expressed concern about the prescription of Eliquis versus Xarelto, and attached a link showing the differences between Eliquis and Xarelto, noting the physician should have been aware that Mr. Burgess had only been effectively treated by Xarelto.

104. On February 19, 2019 at 1937 hours, Beige-Tapp emailed Jill Burgess indicating that she would be speaking again with the Clinical Director tomorrow and would share her concerns, indicating that she believed they would look more closely at the case now that she has reached out, but indicating that it is essentially all she could do.

39

105. On February 20, 2019 at 0811 hours, Mr. Burgess emailed his wife outlining the Xarelto/Eliquis issue. In short, Mr. Burgess described his history of blood thinner trials and the lack of success with anything other than Xarelto, expressing concern with the swelling in both legs was consistent with all his other prior episodes of blood clots. **Mr. Burgess expressed concern about having a total break in any coagulation when he first stopped Xarelto and waited to get his Eliquis. Mr. Burgess described simply wanting an ultrasound that would confirm or verify clots in his legs, expressing concern that the delay in Heparin treatment would have allowed the clots to harden, leaving him with long-term damage. Mr. Burgess described the situation as being frustrating and extremely painful**. Mr. Burgess also described having correctional officers and a nurse tell him that he needed to stay in the medical staff's face or he would not get the attention needed. Mr. Burgess signed off in the email describing being unable to sleep because of the pain, but trying to deal with it as best as he could.

106. On February 20, 2019 at 1223 hours, Jill Burgess received an email from Beige-Tapp, U.S. Probation Officer, asking her to call Beige-Tapp at (704) 680-2950 when she had a chance.

107. On or about February 20, 2019 at 1500 hours, Ms. Harmon (Mr. Burgess' counselor from Durham A) came to check on Mr. Burgess since his move to the Vance A unit. Ms. Harmon informed Mr. Burgess that she was asked to look in on him by both his wife and the probation officer. Additionally, the Vance A counselor, Mr. Faucet, also came by check on him a few times.

108. On February 20, 2019 at 1544 hours, Mr. Burgess sent his wife an email in which he described Ms. Harmon coming to see him because of the efforts of his wife. Mr. Burgess indicated that he was unsure medical would be able to do anything for him without sending him to the medical center. Mr. **Burgess again described his leg pain and back pain, with the leg pain**

40

**being much worse, expressing concern the clotting issue was a priority, expressing that he had only 96 hours in that condition before damage was done**.

109. On February 21, 2019 at 1723 hours, Jill Burgess emailed Beige-Tapp again thanking her for her assistance. Jill Burgess inquired if Ms. Tapp was going to be receiving any further information, expressing concern that the only way to see a clot was by EKG and that the longer Burgess went without treatment, the greater the chance of the clot growing or the throwing of a PE. Jill Burgess expressed in the email concern that the longer the clot was not treated the more damage that is done. Jill Burgess expressed concern about the possibility of Burgess going to an outside hospital, but stated they were not trying to avoid Mr. Burgess paying his time. Jill Burgess profusely thanked Ms. Tapp for all of her assistance.

110. On February 21, 2019 at 1353 hours Mr. Burgess emailed his wife, describing that he was having a hard time eating and keeping it down because of the nausea.

111. On February 22, 2019 at 0730 hours, Mr. Burgess sent an Op-Out to medical entitled "Medical Emergency," explaining his condition and begging for help from the medical staff.

112. On February 22, 2019 Jill Burgess emailed what is believed to be the Butner Warden at BUF/EXEC Assistant@ BOP.gov, indicating that she was reaching out as her husband was getting no treatment for a life-threatening condition. Jill Burgess asked that Butner medical look at Mr. Burgess' PR Report where they would see that Mr. Burgess suffers from blood clots and has almost died from having them in the past, also describing that his vascular doctor had written a letter about his condition. Jill Burgess described that her husband had informed medical that he had developed a blood clot, but that they were not doing anything other than prescribing compression socks and Lasix. Jill Burgess inquired why her husband was not in the medical

41

facility as he needed a Heparin drip. Jill Burgess also described how a Probation Officer had informed the Judge that Butner medical would not change Mr. Burgess' medications if he came to Butner and that his leg compression sleeves would be allowed – which was incorrect. Jill Burgess advised that she had contacted the Probation Officer, the Judge, his attorney, and the M.D. for the Health Services at BOP. Jill Burgess advised that her husband was there for a 13-month sentence and should not die in their facility due to a lack of care.

113. On February 23, 2019 at 0918 hours, there is a BOP Sick Call note prepared by A. Eddins, RN. According to the chart note, Mr. Burgess was complaining "**I am really hurting in my legs and I am unable to get comfortable in any position. I have a history of blood clots. I have been wearing my thigh-high compression stockings but they are cutting off my circulation. It looks like two tires. It's not PE, I know what that feels like**." It was charted by RN Eddins that the inmate reported to medical per counselor request. **Mr. Burgess was rating his leg pain as an 8/10, describes as throbbing. Nurse Eddins charts that Mr. Burgess has been in medical complaining of pain and unable to walk due to the pain and swelling in his lower extremities. Mr. Burgess described a history of blood clots and stated that the pain is a throbbing and burning sensation in the pelvic area and the area above his knees**. Mr. Burgess described taking Ibruopen 800 mg, two to three times a day. Mr. Burgess denied chest pain, headache, shortness of breath and numbness or tingling in his lower extremities. The note reflects that Mr. Burgess described getting shortness of breath when getting dressed, and also described decreased appetite. Mr. Burgess described wearing his above the knee compression stockings and **described more swelling in his upper thighs**. Mr. Burgess described more discomfort when wearing the above the knee stockings. Physical exam described Mr. Burgess' legs warm to touch, normal pulses bilaterally and capillary refill at less than three seconds. The

42

exam found no swelling or discoloration in Mr. Burgess' feet. RN Eddins charts that **Mr. Burgess is concerned about his therapeutic levels and seems very anxious about this history of DVTs**.

114. A further chart note that same day described that while Mr. Burgess was in medical, a nurse went to his unit to go through his medications and described that he was "not taking aspirin, Prozac, Mobic or Prazosin correctly," and the nurse was unable to find his blood thinner. This chart note describes the inmate being advised to bring all medications to medical so they could place him in the pill line to ensure compliance. This note advised Mr. Burgess to continue to wear below the knee compression stockings, and Mr. Burgess was advised that an appointment was being made with his MLP (mid-level provider) on Monday for him to discuss these issues. This chart note reflects that Nurse Eddins would recommend that his medications be placed on the pill line and advised Mr. Burgess to report back to medical if his shortness of breath was not normal.

115. Outside of what appears in the charting for the event on February 23, 2019, Mr. Burgess was called to medical and seen by Nurses Eddins, Harvey and Ashe. Mr. Burgess' vital signs were taken, and he was allowed to explain his current condition and his prior medical history. Mr. Burgess was then asked about his medications and whether he has been taking them and went through the list with the nurses explaining how he maintained his medications. Nurse Harvey apparently left during the meeting and went to do an inventory of his medications from his locker. After the meeting, Mr. Burgess was told to bring all his medications to medical to be administrated by his provider. Mr. Burgess was released, returned to his unit via a wheelchair with ICP assistance, and immediately returned with the medications from his locker to medical providing them to Nurse Eddins as instructed. The Eliquis was part of the medications that he returned.

116. On February 25, 2019 at 0930 hours, Mr. Burgess reported back to medical as instructed by Nurse Eddins for his MLP – who was NP Adkins. After waiting for over an hour,

43

NP Adkins entered the waiting area of medical on the way to pharmacy. Mr. Burgess called out to NP Adkins and when Mr. Burgess called out to her, NP Adkins immediately asked why he was in medical. Mr. Burgess informed NP Adkins that Nurse Eddins had instructed him to report to medical that day. and NP Adkins replied "no" and that she would not see him that day. NP Adkins informed Mr. Burgess that she would see him when he was placed on the Call Out Sheet and not before. Mr. Burgess then returned to his unit via a wheelchair with ICP assistance.

117. On February 25, 2019 Mr. Burgess emailed his wife at 1045 hours relaying how he was instructed by medical on Saturday to report to medical at 0930 hours that day to see NP Adkins, and then he reported as requested, only to be told by NP Adkins that she would not see him that day. Mr. Burgess described that NP Adkins shook her head and then said "no" and walked off.

118. A BOP Sick Call Note of NP Adkins on February 26, 2019 at 1000 hours **charts Mr. Burgess' complaint of swelling and that he started having more pain in his legs about nine days ago which felt like what had occurred when he had a previous blood clot. NP Adkins charts an exam seeing Mr. Burgess for complaints of increased swelling and discomfort in his lower extremities' times nine days. NP Adkins notes Mr. Burgess reports increased difficulty with walking and discomfort in thighs. The note reflects that Mr. Burgess denied any precipitating injury**. The note comments that Mr. Burgess describes his legs getting "tired" and difficulty climbing stairs due to lower extremity weakness and "becoming winded." **The chart note reflects that Mr. Burgess had a history of DVT** and reports compliance in wearing TED hose. The note reflects Mr. Burgess would attempt to wear thigh high TED hose but was unable to wear them due to discomfort and swelling in his thighs. The note reflects that Mr. Burgess had a sedentary lifestyle immediately prior to incarceration and the **note**

44

**reflects that Mr. Burgess had previously treated for bilateral lower extremity edema and weakness with sequential compression sleeves**. **This note reflected a pain scale score at 3-4/10 at rest and that pain increases to 8-9/10 with ambulation**. It is charted that Mr. Burgess treated his discomfort with OTC Ibuprofen and obtained moderate improvement in his pain. **At the time of the exam, Mr. Burgess described his pain as 8/10 and described the pain as throbbing**.

119. NP Adkins' assessment was of gait abnormality, muscle weakness and leg swelling. Mr. Burgess was instructed to return to sick call if condition worsens or if he develops any increased discomfort or hardened/reddened areas to his legs. The plan listed was to obtain a baseline venous ultrasound of his legs. NP Adkins referred Mr. Burgess to PT for evaluation and general endurance conditioning. NP Adkins charted that Mr. Burgess expressed interest in increasing activity with the goal of ambulating independently. Mr. Burgess was instructed to continue with OTC NSAIDs for discomfort PRN.

120. What does not appear in the medical charting of the February 26, 2019 encounter with NP Adkins is the following: The encounter stated with Mr. Burgess attempting to wheel himself into NP Adkins' office by wheelchair. Mr. Burgess was told by NP Adkins to leave the wheelchair outside her office in the hallway. Mr. Burgess informed NP Adkins that he needed the wheelchair to get around as he could not walk or stand without assistance. To that, NP Adkins responded, "how do you go to the bathroom," and Mr. Burgess described using the handicapped stalls assisted by handrails, walls, and the stall door. At her insistence, Mr. Burgess described awkwardly transferring himself from the wheelchair into her office chair using the walls, arms of the wheelchair and her office desk. NP Adkins did not attempt to assist him at any time. **The first thing NP Adkins did was to then proceed to read the email from his wife to the Warden.**

45

**After reading about the first paragraph of the email, NP Adkins stopped reading the email, looked at Mr. Burgess and said "yada, yada, yada and so on and so on . . . whatever." NP Adkins looked at Mr. Burgess, rolled her eyes and made the comment "Oh please" as if she were disgusted by his wife's intervention**. NP Adkins then said was this was simply not true – referring to his wife's email. Mr. Burgess then had a minor confrontation with NP Adkins where she accused him of yelling at her, admittedly Burgess had raised his voice, because NP Adkins had insulted Mr. Burgess' wife and also insinuated that Mr. Burgess was lying to her. Burgess defused the situation by apologizing to NP Adkins. Mr. Burgess was then instructed to move from the office chair to the examination table after removing his pants. Mr. Burgess was examined by NP Adkins who poked and prodded with her fingers in his upper thigh and groin area. Mr. Burgess asked NP Adkins why there was so much swelling in both legs from his feet to his thighs and why his legs were so discolored and purplish all the way up to his stomach area. NP Adkins responded it was most likely caused by having to walk around the compound and not being used to it. Mr. Burgess explained to NP Adkins that he had been enrolled in three fitness classes and recreation when first reporting to Butner. **During this conversation, NP Adkins then asked him what he wanted her to do for him and Mr. Burgess said that he requested that she order him an ultrasound of his legs, and NP Adkins agreed to do that**. Mr. Burgess also requested that he be considered for physical therapy in the future, if and when he recovered, and NP Adkins agreed to do that. Mr. Burgess left medical and returned to his housing unit via his wheelchair and ICP assistance.

121. On February 26, 2019 at 1114 hours, there is a medical device approval chart entry made by NP Adkins, noting that Mr. Burgess was to be allowed to have a wheelchair.

46

122. On February 26, 2019 at 1143 hours, Mr. Burgess emailed his wife describing the encounter with NP Adkins as described as above. **Mr. Burgess described his conditions at Butner as being horrible but feeling happy that he got the ultrasound that he requested**.

123. On February 27, 2019 at 1648 hours, Mr. Burgess presented to sick call and was seen by EMT-P Lori Boykin complaining "my chest started hurting when I got back from work and my anxiety is getting the best of me. Anytime I have a problem, the anxiety kicks in. I can't control it." **EMT-P Boykin described Burgess' pain as 8/10**, vitals of 130/72-84-24-98.7-100% RA. Mr. Burgess described chest pain which was sharp and intermittent. EMT-P Boykin noted that **Mr. Burgess was very anxious, tense, trembling and hyperventilating**, although she was able to calm him down during the encounter. Once Mr. Burgess calmed down, his demeanor changed, and his oxygen saturation was 100%. Mr. Burgess was given three Tylenol tablets and informed that the ultrasound for his legs was pending.

124. Mr. Burgess also wrote an email to Jill Burgess on February 23, 2019 at 1737 hours relaying the events of that day's medical encounter, again confirming that once he knew his O2 saturation level was 100% he was much relieved. **Mr. Burgess also mentioned to his wife that his legs continue to swell and are bigger that day than ever**.

125. On February 28, 2019 at 0530 hours, Burgess' was awakened and notified of a trip to FMC (Federal Medical Center) scheduled for that day. However, due fog that morning, the compound was closed indefinitely, and the trip was cancelled for that day. **On February 28, 2019 at 1033 hours, Burgess attended sick call and was seen by NP Adkins, where he complained of increased edema and discomfort**. NP Adkins noted Mr. Burgess' history of DVT in bilateral legs and thighs, and noted there was a plan for venous ultrasound of the bilateral lower extremities. On February 28, 2019 at 1048 hours, Mr. Burgess emailed his wife describing cancellation of his

47

exam at FMC because of fog, of his sick call visit, and describing his pain levels as more than he could handle that day.

126. There is a March 1, 2019 Butner FMC Radiology Report for a venous Doppler ultrasound study. The study was indicated due to Mr. Burgess' history of DVT and increasing lower extremity edema and discomfort. The study was to include bilateral lower extremity deep veins including the common and superficial femoral veins and popliteal veins from the groin to the knee. The findings of the venous Doppler study were as follows: **Extensive deep venous thrombi. Deep venous thrombosis is identified within the common and superficial femoral vein and popliteal veins bilaterally. These are occlusive with the exception of the right popliteal vein which is incompletely occlusive. Comments noted that the preliminary report was called by the performing ultrasound technologist to Dr. Valdez and NP Adkins on March 1, 2019 at 1100 hours.**

127. There is a March 1, 2019 Butner BOP Administrative Note of Dr. Michael Valdez which describes Mr. Burgess with known history of recurrent DVT/PE already on Eliquis. Dr. Valdez describes that per Mr. Burgess, Mr. Burgess had an unknown etiology for hypercoagulable disorder. **Dr. Valdez described Burgess as having undergone bilateral lower extremity ultrasound for baseline evaluation and reportedly had bilateral occlusive DVT.** In the Administrative Note, Dr. Valdez describes Mr. Burgess as reporting compliance with medication Eliquis and treatment options to continue anticoagulant but would change the regimen for possible DVT progression. **Dr. Valdez noted the need for retrieving prior treatment records to be reviewed and compared to his current DVT condition.** The chart note reflects Mr. Burgess was informed and was willing to adjust medication to include Lovenox and Coumadin. Dr. Valdez charted that Mr. Burgess would stop Eliquis and see the pharmacy Monday for Coumadin clinic.

48

The plan noted by Dr. Valdez was Lovenox 120 mg two times per day, and start Coumadin 5 mg every evening, and stop Eliquis. Dr. Valdez charted that medical will try to obtain medical records for comparison of prior imaging to current DVT status.

128. In addition to what is contained in the medical chart of the March 1, 2019 Valdez encounter, when Mr. Burgess returned to LCSI Butner, he was met by Dr. Valdez in medical who called him back to his office. Dr. Valdez indicated to Mr. Burgess that he had just received Burgess' ultrasound results and "had never seen anything like it." Dr. Valdez indicated that he wanted to discontinue Eliquis and start Burgess on Coumadin and Lovenox. Mr. Burgess told Dr. Valdez that Mr. Burgess had failed Coumadin therapy several times in the past on the outside and as a result was treated with Heparin to stabilize him. Dr. Valdez responded that BOP mandated that he should treat Mr. Burgess with formulary drugs, but if Mr. Burgess chose not to receive it, he would have to sign a waiver of treatment. Mr. Burgess responded by saying that it was obvious that the Eliquis was not working, so if the only other option were Coumadin, that he would take it.

129. On March 4, 2019 at 0904 hours, BOP Butner Administrative Note of Mickey Ha, Pharm.D charts inmate with history of hypercoagulable disorder with unknown etiology and has multiple DVT/PEs. Reports that he has been controlled on Coumadin in the past but had to continually increase doses. Pharm.D Ha notes that Mr. Burgess was in transition to Xarelto by his physician which he states has managed his situation well. **Pharm.D Ha charts that upon Mr. Burgess' arrival at Butner he was transitioned to Eliquis which Mr. Burgess stated has caused dramatically increased swelling in his legs starting a month ago**. Pharm.D Ha noted that based upon Mr. Burgess' history and significant clotting that he should be monitored closely and maintained with Coumadin therapy at an INR of 2.5 to 3.5, noting that he was taking 5 mg Coumadin every evening with Lovenox 120 mg 2 x per day. Pharm.D Ha's notes reflected that at

49

that time Mr. Burgess was subtherapeutic with a 1.4 INR and increased his Coumadin by 20% to 6 mg of Coumadin every evening starting on 03/05/19. That evening, Pharm.D Ha provided 10 mg Coumadin, continuing Lovenox, until therapeutic. The note reflected that Mr. Burgess labs were to be re-checked in one week.

130. On the same day, March 4, 2019 at 0932 hours, there is a BOP Butner Sick Call Report completed by Natasha Ashe, RN, charting Mr. Burgess' complaint of his need to request a medical idle from UNICOR. Mr. Burgess indicated the need to rest his legs, and described his doctor has told him to keep his legs straight and elevated, requiring that he take a break from his job. The chart note reflects that Mr. Burgess was seen in sick call, reporting the results of his venous Doppler study revealing blood clots in both legs. Mr. Burgess denied pain or discomfort at that time, was not short of breath and was able to articulate his needs without issue. **It was noted that Mr. Burgess was still utilizing the wheelchair** and had denied any falls. The medical idle was granted that day through March 7, 2019.

131. On March 4, 2019 at 1020 hours there is a BOP Butner Administrative Note entered by Dr. Michael Valdez describing review of the Pharm.D note of that same day, agreeing with the action and plan for continued Lovenox and increase in Coumadin. There is also BOP Butner Pharmacy Note of the same day charting the prescription of Coumadin 6 mg at that time.

132. On March 5, 2019 at 0826 hours, BOP HIT documents the 03/01/19 radiology report scanned into Document Manger for Mr. Burgess' file. On March 5, 2019 at 1920 hours, there is a charting of 6 mg Coumadin was provided to Burgess.

133. On March 6, 2019 Burgess went to sick call and was seen by Nurse Eddins, and Mr. Burgess discussed the swelling in his legs and needing to get a pass to avoid having to wear

50

"institutional boots" in the compound.  Mr. Burgess was advised that Nurse Eddins would speak to his provider about the issue, and he was then released.

134.    On March 6, 2019, Mr. Burgess was leaving the shower in his wheelchair when he was approached by his counselor, Mr. Faucett.  Mr. Faucett noticed the condition and coloring of his legs, which were heavily swollen and purplish in color, commenting that he would send an email to Ms. Jacobs regarding his current condition.

135.    On March 11, 2019, BOP Administrative Note of James Clay, Pharm.D charted that Mr. Burgess' INR is 2.5.  The chart note reflects Mr. Burgess receiving Coumadin 6 mg every evening with LMWH[3] bridge. Pharm.D Clay notes that the primary INR target is 3.0.   The pharmacist notes that Mr. Burgess has an IVC filter and is being periodically monitored for clot burden, and that outside records have been requested.  The note goes on to reflect that Mr. Burgess has a history of hypercoagulable stated with unknown etiology and has multiple DVT/PEs.  The history includes a history of DVT while on Eliquis. The note reflects that Mr. Burgess has been controlled by Coumadin in the past but had to continually increase doses.  The pharmacist noted that Mr. Burgess was in transition to Xarelto by his physician which Burgess had stated had managed his situation well.  **Pharm.D Clay notes that Mr. Burgess described arriving at Butner, being transitioned to Eliquis which Burgess stated dramatically increased the swelling in his legs**.  The plan was to continue with medications as prescribed, with repeat INR in one week.

136.    On March 14, 2019 there is a BOP Butner Administrative Note by Pharm.D James Clay indicating that he visited Mr. Burgess in housing unit that morning where Mr. Burgess stated

---

[3]LMWH (low molecular weight heparin)(The most bioavailable fraction of heparin. It has a more precise anticoagulant effect than unfractionated heparins and is used to prevent and treat deep venous thrombosis, pulmonary embolism, and acute coronary syndromes.)

that he had attempted to walk earlier that morning using his wheelchair as a walker but that the pain in his legs would not allow him to continue. Pharm.D Clay asked that Mr. Burgess come to medical on his next move to check his INR and Mr. Burgess arrived in medical at 0930 hours. It was charted that Mr. Burgess had not missed any doses since his last visit. This Administrative Note reflects Mr. Burgess had DVT progression while on Eliquis and that Coumadin was initiated on 03/04/19 with INR of 2.5 on 03/11/19 with INR on that date of 2.2. The primary target was 3.0 INR. Pharm.D Clay's note reflects Burgess' IVC filter in place with periodic monitoring for clot burden and the note mimics the earlier Pharm.D Clay note reflecting Mr. Burgess' use of Coumadin, transitioning to Xarelto and dramatic increase in swelling in his legs when arriving at Butner after transitioned to Eliquis. On that date, there is also further BOP Butner Pharmacy Order for Coumadin of 7.5 mg each evening.

137. On March 18, 2019, there is a BOP Butner Administrative Note entered by Pharm.D James Clay describing Mr. Burgess' INR that day at 2.9. Pharm.D Clay outlined Burgess' historical Coumadin dosing amounts and that there had been no dose omissions. Again, Pharm.D Clay charted that Mr. Burgess had DVT progression while on Eliquis. The plan to continue Coumadin at 7.5 mg every evening. Again, Pharm.D Clay's note reflects that outside records requested.

138. On March 19, 2019 at 1641 hours, there appears to be an email from Mr. Burgess to Dr. Michael Valdez describing that Dr. Valdez had spoken to Pharm.D Clay the previous day about inquiring about Mr. Burgess' medical file. The primary topic of this email relates to Mr. Burgess being returned to work at UNICOR, and having to sit most of the day at work, which had caused his legs to swell to the worst point in several days. **Mr. Burgess described going to medical at 1330 on that date, where he had been informed that he had been cleared to return**

52

**to work even though the work required extensive sitting. Mr. Burgess inquired whether given the extent of the vascular damage to his legs, he wanted to make sure that he did no further damage and was writing to request that Valdez confirm that medically he was cleared to resume work** and that his medical records be updated to reflect the same. Mr. Burgess thanked Dr. Valdez and advised to let him know if he needed anything further from Mr. Burgess.

139. On March 21, 2019 at 0954 hours, there is a BOP Butner Administrative Note entered by Pharm.D James Clay describing that Mr. Burgess was a no-show for INR evaluation.

140. On March 25, 2019 at 0852 hours, there is a BOP Butner hematology consult performed by Andres Carden, M.D. Dr. Carden described Mr. Burgess as a pleasant 49-year-old gentlemen who presented to the Hematology Clinic for evaluation of history of multiple deep venous thrombosis and pulmonary embolus with a likely underlying undiagnosed hypercoagulable disorder. Dr. Carden's consult note reflected that Mr. Burgess' medical history is remarkable for recurrent blood clots, and that since 2001 Mr. Burgess had multiple episodes of DVTs and PEs. The Carden consult note reflects that in 2001 Mr. Burgess had a permanent IVC filter placed due to DVTs, describing in 2016 that Mr. Burgess had a clot in the filter. Dr. Carden described a history of work-up for clotting disorders at WFBMC (Wake Forest Baptist Medical Center) and noted that Mr. Burgess had a family history of lupus anticoagulant. It was charted that Mr. Burgess had been unable to be tested for the lupus anticoagulant because he was unable to stop anticoagulation to be evaluated for his underlying disorder. In describing Mr. Burgess' history, Dr. Carden describes that Mr. Burgess was on Coumadin with or without Lovenox from 2001 to 2017. Dr. Carden describes Mr. Burgess' history as being on Xarelto from February 2017 through December 2018. Dr. Carden's history describes Mr. Burgess being placed on Eliquis in January 2019 and in March 2019, an ultrasound of bilateral lower extremities showed extensive bilateral DVT, and Coumadin

and Lovenox therapy in March of 2019. The chart note reflects that Mr. Burgess described swelling in his legs, which was identified by Dr. Carden as bilateral lower extremity edema on examination. Dr. Carden's impression was that Mr. Burgess had a history of multiple deep venous thrombosis and pulmonary emboli with likely underlying undiagnosed hypercoagulable disorder. In the recommendations section of Dr. Carden's note, he described having a lengthy conversation with Mr. Burgess in regard to his underlying diagnosis and ongoing management. He described a plan to obtain a CT scan to access for progression or regression of the clotting on the Burgess IVC filter. **Dr. Carden also recommended restarting Xarelto and stopping the Coumadin and Lovenox**. Dr. Carden charts that Mr. Burgess is stating he had a short sentence and was getting out later that year and would continue his ongoing management at WFBMC. **Dr. Carden voiced that he recommends restarting Xarelto because of Burgess' previous success with this medication**. Dr. Carden acknowledged that Burgess understood the plan and the chart note reflected Dr. Carden as saying "Thank you for the delightful consultation."

141. Outside of what appears in the charting of Dr. Carden, Mr. Burgess indicates that Dr. Carden asking him why he had been taken off the Xarelto, to which Burgess replied, "That's the million-dollar question."

142. On March 25, 2019 at 1049 hours, there is a BOP Butner Administrative Note entered by James Clay, Pharm.D describing inmate not available at this time for INR evaluation – at hematology consult. On the same day, March 25, 2019 at 1142 hours, BOP Butner Administrative Note entered by James Clay, Pharm.D describes that hematology recommends anticoagulation change to Xarelto, referencing BEMR note for 03/25/19 at 08:52 by Dr. Carden. It was charted that Xarelto would be requested via non-formulary process and initiated once approved. Pharm.D Clay again repeats his earlier charting of Mr. Burgess' history of

Case 1:21-cv-00805-LCB-JLW  Document 11  Filed 03/18/22  Page 54 of 82

hypercoagulable disorder of unknown etiology with multiple DVT/PEs, reported that it had been controlled by Coumadin in the past but had to increase doses until transition to Xarelto, which had managed his situation well until transition to Eliquis at Butner which had caused dramatically increased swelling in his legs.

143. There is a further March 25, 2019 BOP Butner Administrative Note at 1159 hours, entered by Michael Valdez, M.D. charting his recognition of the pharmacology and coagulation clinic note and agreeing with the plan of action, describing that Xarelto was ordered. A further BOP Butner Administrative Note entered by Pharm.D Clay on March 25, 2019, timed at 1305-1317 hours notes that Mr. Burgess had just returned from the medical center. His INR at that time was 1.2. Pharm.D Clay charts starting Lovenox subcutaneous injections two times a day for three doses. Last dose should be the evening of March 26, 2019. Mr. Burgess is noted to be at high risk and will therefore require LMWH for now and will require expedited transition to Xarelto, to begin the morning of March 27, 2019.

144. On March 26, 2019 there is a Butner pharmacy note for a prescription of Xarelto 20 mg daily entered by Dr. Michael Valdez.

145. On March 29, 2019 at 1046 hours, Mr. Burgess emailed Butner medical records, requesting a copy of his medical records since his last request, also indicating his desire to receive an ultrasound of his legs. Mr. Burgess mentions there should be an ultrasound included in this most recent request. Additionally, on March 29, 2019 at 1420 hours, Dr. Michael Valdez acknowledged receipt of a hematology consult note and indicated that he would order a CT scan to access for progression of the clot burden on Burgess' IVC filter.

55

146.	On April 1, 2019 Mr. Burgess filed with Butner FCC Warden Smith a Petition for Compassionate Release, requesting a reduction in his sentence due to a significant worsening of his condition since his incarceration due to lack of care by Butner medical.

147.	On April 1, 2019 at 1137 hours, Dr. Michael Valdez ordered a basic metabolic panel for Mr. Burgess, to be performed prior to a CT scan being completed.

148.	On April 3, 2019 at 0908 hours, there is a BOP Butner Rehabilitative Services note entered by T. Nobles, MPT/OCS indicating that Mr. Burgess did not show for consultation/evaluation by rehab services on that morning. On the same date, April 3, 2019 at 00930 hours there is a BOP Butner Administrative Note entered by Pharm.D Ha noting that Mr. Burgess did not show for the anticoagulation clinic that morning.

149.	On April 4, 2019 at 0800 hours, there is a BOP Butner Sick Call Note entered by Pamela Harvey, RN that described a **chief complaint by Mr. Burgess of having protruding veins on the sides of his abdomen and chest, concerning for his IVC filter. RN Harvey's note describes Mr. Burgess with a history of multiple bilateral DVT and PEs with a Greenfield IVC filter in place who presents to sick call with complaints of abdominal pain and "protruding veins" to the upper abdomen and chest area that he noticed two days ago. Mr. Burgess reported throbbing pain in the area of 3/10**. RN Harvey described the ultrasound performed in March 2019 showing multiple bilateral DVTs in the legs. Mr. Burgess denied shortness of breath, pain to legs or feeling of heaviness to legs. Mr. Burgess reported that he just started back on Xarelto. It was reported that Mr. Burgess ambulated into medical with a steady gait, and his vital signs were stable. Mr. Burgess' lungs were noted as being clear with easy respirations. The examination showed on the right and left upper abdomen marked protruding veins. RN Harvey noted slight bilateral lower leg edema with knee-high TED stockings in place.

56

RN Harvey charts discussing this with the "provider" [Dr. Valdez]. On the same date, April 4, 2019 at 0915 hours there is a BOP Butner Administrative Note entered by Dr. Michael Valdez indicating his review of the nursing note regarding Mr. Burgess, well known to him with a history of DVT and PE. Dr. Valdez charts that Mr. Burgess is on appropriate treatment with anticoagulation and that a CT scan had been ordered as well to evaluate clot burden to the IVC filter. The plan of management did not change at that time.

150. On April 4, 2019, while waiting for Dr. Valdez, Mr. Burgess encountered Pharm.D Ha and discussed with Pharm.D Ha why Mr. Burgess had missed the INR clinic CallOut, telling Pharm.D Ha that he had been transferred to the Vance A Building and Mr. Burgess was no longer able to see the CallOut sheet posted in the Durham A Building, and that the CallOuts were not posted on computer. Mr. Burgess also explained to Pharm.D Ha that he was now on Xarelto, and that Pharm.D Ha was unaware of that medication change, indicating that he would no longer need INR clinic visits. There is a further BOP Butner Administrative Note entered by Pharm.D Ha on April 4, 2019 at 0933 hours indicating that regarding Mr. Burgess' anticoagulation clinic on 040319, it appeared that after further investigation, the inmate had been approved for Xarelto, is no longer on Coumadin therapy, and will be discharged from the anticoagulation clinic at that time.

151. On April 10, 2019 there is a BOP Butner Radiology Report from FMC completed by Dr. Christopher Cepeda indicating that Mr. Burgess underwent a CT scan of his abdomen that showed **extensive thrombosis inferior to the IVC filter with thrombosis extending into the bilateral common and external iliac veins in and to the visualized portions of the bilateral femoral veins. Most of this thrombus appears to be occlusive or nearly occlusive.** Mr. Burgess' IVC filter was appropriately positioned inferior to the renal veins and that the veins and suprarenal IVC are patent.

57

152.     On April 12, 2019 at 1248 hours there is a BOP Butner Administrative Note entered by Michael Valdez, M.D.  Dr. Valdez charts that his review of the CT scan, noting that Mr. Burgess' hypercoagulable of unknown etiology with history of DVTs with a clot inferior to his IVC.  Dr. Valdez charts that Mr. Burgess is already on Xarelto for treatment of DVT and clot, describing that no additional medications or change in the current plan was appropriate.

153.     On April 16, 2019 there is a BOP Butner Sick Call note completed by Lori Boykin, EMT-P describing a complaint of right elbow pain.  The chart note reflects that Mr. Burgess describes bending over to pick up something and becoming very dizzy.  Mr. Burgess described not being sure if he passed out but does not remember hitting his elbow.  The sick call report completed by EMT Boykin describes a review of the elbow, reports a denial of chest pain or shortness of breath, but notes Mr. Burgess to be slightly hypotensive.  Interestingly, there is no concern raised about Mr. Burgess' substantial clotting issues, his known current bilateral DVTs and clot inferior to his IVC filter and no evaluation done for those real issues.

154.     On April 17, 2019 at 2254 hours, there is an email to Dr. Michael Valdez from Mr. Burgess.  In that email, Mr. Burgess thanks Dr. Valdez for getting him the ultrasound and CT scan. Mr. Burgess described going to **Sick Call on 04/04/19 to see RN Harvey because he was having abdominal pains, dizziness, and headaches, also describing the development of surface veins protruding on both sides from hip to chest area.  Mr. Burgess indicated in his email that although he has never had these exact symptoms, he understood that this is indicative of his body trying to compensate for restricted blood flow back to his heart**[4].  Mr. Burgess described that he was held in medical while RN Harvey consulted with Dr. Valdez, indicated that he understood the CT scan results were back, and questioned what was causing these new symptoms

---

[4] When the body has an area of ischemia, caused by a lack of oxygen, the body has the ability to grow new blood vessels to supply blood and oxygen to that oxygen deprived tissue, referred to as revascularization.

58

and if there was anything that could help these new symptoms. Mr. Burgess described being scared, believed this to be a new progression of symptoms that he has never experienced, and described that even wheeling himself in his wheelchair now caused him dizziness and light headedness after a short time. Mr. Burgess described trying to stand some at work because remaining seated caused swelling in his legs faster. Mr. Burgess described in his email to Dr. Valdez that his health condition was causing him great anxiety, and that he desired to have a better understanding of the information related to his new symptoms, asking for clarification from Dr. Valdez.

155. On April 24, 2019 at 1158 hours, there is a BOP Butner Administrative Note entered by T. Nobles, MPT/OCS in Rehabilitation Services. This consultation was noted to be for an inmate with a history of DVT/PE and BLE swelling. **It was noted that the inmate was currently ambulating on compound with a wheelchair due to difficulty ambulating for long distances**. Ms. Nobles charted that this patient with a diagnosis of hypercoagulapathy of unknown etiology with noted history of DVTs. Mr. Nobles charts that Mr. Burgess has a clot inferior to the IVC per the CT scan. Ms. Nobles charts the patient is on anticoagulant therapies and reports dizziness and decreased blood pressure with standing/walking. Ms. Nobles charts that she is not sure at that time what the safe level of exercise for Mr. Burgess is at that time due to his condition. **Ms. Nobles charts that the primary care team is not certain of the extent of the IVC clot**. Ms. Nobles charts that she will not continue with the consultation as the order for Rehabilitative Services was placed prior to the finding of the IVC clot. Ms. Nobles charted her desire to have further review by the primary care providers prior to setting exercise goals and limitations, asking for input from the primary care team.

59

156. On April 25, 2019 at 1136 hours, BOP Butner Sick Call charting is done by Natasha Ashe, RN, who **described Mr. Burgess' chief complaint of having abdominal pain for one month**. Nurse Ashe describes Mr. Burgess' complaint of 4/10 diffuse abdominal pain, which was described by Mr. Burgess as starting one month ago and worsening with activity such as walking or performing his job duties. Mr. Burgess denied issues with urination or bowel movements. Mr. Burgess was instructed to continue using his wheelchair to cut down on physical exertion. A physical exam by Nurse Ashe showed Mr. Burgess' abdomen was non-tender to touch, bowel sounds present times four, with an abdomen soft and non-distended.

157. An April 29, 2019 BOP Behavioral Health note entered at 1258 hours by Matthew Badgett, APRN-C described Mr. Burgess reporting to be doing well. Mr. Burgess reported his ongoing health problems, but denied suicidal ideation, homicidal ideation, or auditory verbal hallucinations. Mr. Burgess reported hypotensive episodes recently, though reported good mood at that time. Mr. Burgess' insight and judgment were deemed fair, and he was noted to be otherwise doing well. APRN Badgett described Mr. Burgess' mood as stable, indicating he would reduce Mr. Burgess' dose of Prazosin to help with the hypotensive episodes. APRN Badgett charted Mr. Burgess with diagnoses of depressive disorder/PTSD.

158. On May 7, 2019 there is a BOP Butner Sick Call charting done by NP Adkins at 1000 hours. **The complaint is listed as Mr. Burgess describing abdominal pains and noticing veins on his stomach**. Mr. Burgess is noted saying that it is not enough to make him take Tylenol or Motrin. NP Adkins notes that Mr. Burgess had been seen for complaints of varicosities[5] to bilateral lateral abdomen times one month. She describes Mr. Burgess admitting to dull abdominal

---

[5] Varicosities is the plural of varicosity, which is the condition of having varicose veins, which are the permanent dilation and tortuosity of the veins. Varicosities generally occur as a result of a reverse venous flow, or venous insufficiency.

pain, between 2-4/10. NP Adkins charted Mr. Burgess' reports that pain increase with activity, but denied constipation or change in bowel pattern, nausea, vomiting, diarrhea, or weight loss. NP Adkins discussed with Mr. Burgess his family history of colon cancer and his recent stool history. The physical exam showed diffuse sharp abdominal pain of 4/10. **Physical exam showed scattered varicosities to his bilateral flanks and marble sized nodules noted in Mr. Burgess' right upper quadrant and left mid-abdomen**. NP Adkins' assessment was of unspecified abdominal pain attributed to muscle strain versus diverticulosis. The plan by NP Adkins included checking stool for occult blood. The plan charted that Mr. Burgess' recent abdominal CT scan showed no new acute findings. NP Adkins charted in her plan that she had discussed the possibility of referral to vascular surgery but decided not to pursue it at that time pending halfway house. Mr. Burgess was instructed to follow up with sick call as needed.

159. There is a further BOP Butner note by NP Adkins on May 7, 2019 at 1023 hours for a medical device request, indicating Mr. Burgess may alternate institutional shoes. On the same date, May 7, 2019 at 1911 hours, Mr. Burgess emails NP Adkins, thanking her for seeing him today. Mr. Burgess confirmed that day's discussion about sending him to vascular, that NP Adkins did not feel there was anything that could be done given his limited time remaining. Mr. Burgess asked NP Adkins to reconsider that decision, and asked again if she could schedule him with vascular due to the new symptoms that he was experiencing, to ensure that nothing was being missed.

160. On May 20, 2019 there is a BOP Butner Social Worker note written by Diredre Oretade-Brance, social worker, reflecting social worker – reduction in sentence encounter performed. The chart note reflected receiving a 04/01/19 Burgess request for consideration of compassionate release. Social worker Oretade-Brance noted that email was sent to the medical

61

providers asking if Burgess met the criteria for compassionate release/reduction in sentencing per program statement No. 5050.50.

161.    A **BOP Butner medical records entry of May 21, 2019 reflects that HIPPA forms were sent to Wake Forest Baptist Medical Center, Dr. Gabriella Velazquez-Ramirez (Department of Vascular Surgery) and Dr. Alicia Walters, Peace Haven Family Medicine on that date**. **This appears to be the first medical records request made for any of Burgess' pre-incarceration medical records, and was made over five months after his incarceration.**

162.    On May 24, 2019 at 1217 hours, there was a further email from Mr. Burgess to NP Adkins, in which Mr. Burgess again requested that NP Adkins reconsider sending Mr. Burgess to vascular, because Mr. Burgess was still experiencing these new symptoms and he believed that more could be done for his new symptomology.

163.    On May 31, 2019 at 1346 hours, there is a BOP Butner Social Worker note entered by Diredre Oretade-Brance, which charted that per the medical providers, Mr. Burgess did not meet the criteria for debilitating.  Therefore, there would be a denial memo routed to the Warden for review and signature, denying Mr. Burgess' motion for reduction in sentence or compassionate release.  There is a further untimed chart note on May 31, 2019 which indicated that Mr. Burgess received a letter from Donna Smith at Butner, indicating his request for a reduction in his sentence for compassionate release was denied because it was determined that Mr. Burgess did not meet the criteria for debilitating.

164.    On June 3, 2019 there is a BOP Case Manager note entered by Diredre Oretade-Brance indicating that a denial memo of reduction in sentence request for Mr. Burgess was routed via institutional mail.

62

165.    On June 7, 2019, Mr. Burgess, by and through counsel, filed a Motion for Compassionate Release under the First Step Act in the United States District Court for the Middle District of North Carolina, Docket 1:17 CR 450-1 in the matter before the Honorable Judge Tilley. The Burgess' Motion for Compassionate Release essentially sought Mr. Burgess' early release from prison for what was described as a significant decline in his medical condition which the Motion attributed to the lack of proper medical care while at Butner. Specifically, the Burgess' Motion for Compassionate Release attributed Mr. Burgess' significant medical decline to Burgess being denied by BOP the use of his leg compression sleeves and BOP changing his anticoagulant to one that had been proven to be ineffective.  An Exhibit to this Motion was a June 6, 2019 letter from Dr. Gabriella Velazquez-Ramirez, which supported the Motion and provided in pertinent part the following:

> **I have reviewed [Burgess] most recent medical records and since his incarceration on 12/13/18, he has suffered venous thromboembolic events (VTE) that have further deteriorated his health. He is confined to a wheelchair and has been appointed someone to assist him with his duties associated with daily living. It is my understanding that he was not allowed to use his compression pumps while in prison. In addition, it came to my attention that his medications were interrupted for a period of time and also changed. Unfortunately, one of the medications that he was placed on has not worked for him in the past and has been well documented in his medical records**. Consistency with his blood thinners is extremely important to prevent further clotting.

> **Ultrasound and CT scans performed at Butner Federal Medical Facility have indicated further clotting not only in the pelvic area, but in his abdominal area around the IVC filter. Medical records show these are nearly occlusive**. **It appears that he now has manifesting symptoms of worsening condition including severe lower extremity swell, loss of mobility, and venous protrusions in the abdomen/chest area**. While he was seen by a hematologist nearly 2 months following symptom development, he has not been seen by a vascular surgeon until today. His worsening symptoms and deconditioning grant evaluation as soon as possible, ideally in my clinic since I have cared for him for years.  (emphasis added)

63

166.    On June 12, 2019, there is a BOP Butner Inmate ISDS Form completed by Jennifer Adkins, NP charting Mr. Burgess' medical problems of obesity, hyperlipidemia, depression, PTSD, peripheral vertigo, pulmonary embolism, multiple DVTs, dermatitis, osteoarthritis-hips, low back pain, bilateral leg pain, abdominal pain.  Medications were listed of aspirin, Atorvastatin, Prozac, Mobic, Prazosin, Xarelto and Trazadone.  The medical devices were listed as wheelchair, pillow, eyeglasses, and alternate institutional shoes.

167.    On June 13, 2019 there is a further order entered by Dr. Michael Valdez to the Butner pharmacy for Docket 1:17 CR 450-1 Burgess' prescription of Xarelto 20 mg daily.

168.    The United States of America, by and through Matthew G.T. Martin, United States Attorney for the Middle District of North Carolina, responded to the Burgess' Motion for Compassionate Release on July 11, 2019. In pertinent part, the government response provided:

> Burgess contends that his medical condition has deteriorated since he entered custody. (cite omitted) Specifically, Defendant reports he was not permitted to bring his compression sleeves into custody as contemplated by the district court at sentencing, and that his prescription blood thinner was changed. (cite omitted) Defendant alleges his health has declined as a result and that, despite having been ambulatory prior to reporting into custody, he is now using a wheelchair for a part of each day. (cite omitted)
> ….
> **During the intervening period between the filing of Defendant's motion and the date of this response, the government has been in frequent contact with BOP officials at the Butner facility concerning Defendant's care. Over the course of these communications, the undersigned has been verbally advised that BOP medical officials did not find Defendant's use of his compression sleeves to be clinically indicated. Further, the undersigned has been advised that Defendant was permitted to resume his preferred anti-coagulant prescription medication in lieu of the BOP-prescribed anti-coagulative as of late March 2019. BOP officials have represented to the undersigned that Defendant continues to be provided with appropriate care as determined by its medical officials' professional judgment.**

169.     Despite the professed assertion that the BOP provided appropriate care to Mr. Burgess, the United States of America's response to Burgess' Motion for Compassionate Release concludes with the following:

> **Despite the opinions of BOP medical staff expressed in May of 2019 against Mr. Burgess' request for compassionate release, and in light of the unique and complex circumstances of this case, the government defers to the Court's discretion as to whether Mr. Burgess has established grounds for compassionate release.**

170.     On July 12, 2019 at 0909 hours, there is a BOP Butner Administrative Note entered by Christy Bunn, RN, AHSA in which it is charted that Mr. Burgess informed her that the legal department had contacted his wife on 07/10/19 regarding his leg compression devices.  In this chart note, it was noted that "legal" was diligently working on getting the medical device granted, but needed further information on the device, and that Burgess' wife was asked to send a photo of the device with the specific name, model number and serial number so that the device could be validated by BOP staff.  Mr. Burgess was instructed by RN Bunn that this information was needed from his wife in order to proceed and Mr. Burgess verbalized understanding, although he expressed his concern for using the compression device in his current medical condition with current indwelling DVT.

171.     On July 15, 2019, there is an email from Jill Burgess to Christy Bunn, Health Services Administrator, with attached pictures of the leg compression devices used by Mr. Burgess at home.  Jill Burgess noted in the email that sending the leg compression devices to Mr. Burgess without him being seen by a vascular doctor would not be advisable, since the sleeves were meant to help the blood flow to keep clots from forming.  However, clots had already formed because Mr. Burgess had not received the medical treatment as required, as Jill Burgess pointed out could be seen by her emails and phone calls with the Warden, Ms. Harmon, and Ms. Jacobs.  Jill Burgess

65

questioned why at this point Mr. Burgess' sleeves were such a priority when they had not been. There was then a follow up email from Christy Bunn, BOP Health Services Administrator to Jill Burgess on July 15, 2019 at 1427 hours requesting that she provide the product name, model number and serial number.

172. There is a July 18, 2019 BOP Butner Sick Call note prepared by NP Adkins at 1100 hours. The primary complaint is dizziness with Mr. Burgess describing "I get dizzy when I get up sometimes and have fallen a couple of times." **Chart note reports a history of dizziness for five months when rising to stand, with Burgess admitting to falling two times**. The last fall was described in the first week of June while showering. Mr. Burgess denied coming to medical for injury assessment following the falls and denied bruising or injury. Mr. Burgess reported ambulating by wheelchair, having adequate hydration, history of depression and anxiety and being compliant in taking Prozac, Trazadone and Prazosin every evening. Mr. Burgess described having Prazosin reduced to 1 mg and had been taking it as needed with some improvement in his dizziness. Vital signs at that time were 111/77-66-14. NP Adkins charted Mr. Burgess' extensive history of PE and DVT, that he was currently on Xarelto 20 mg daily. NP Adkins' assessment was of dizziness, which she attributed to deconditioning versus dehydration versus medication side effects versus orthostatic hypotension versus anemia. NP Adkins charted the need for further blood studies, educating Mr. Burgess on possible etiologies and instructed Mr. Burgess to report to medical after any fall or injuries and to report to sick call if his condition worsens. NP Adkins' plan was for pending blood results, a PT consult and vascular consult, to follow up in one month.

173. The Honorable Carlton Tilley, Jr. issued an Order regarding the Burgess' Motion for Compassionate Release on July 25, 2019, finding in relevant part the following:

> **Prior to sentencing, the Court considered evidence of the defendant's medical condition in support of a motion for downward variance. The evidence showed**

66

**the defendant suffers from many health problems, including a hypercoagulation disorder of unknown origin, which puts him at an increased risk for blood clots.** (cite omitted) **The sentencing took place over several sessions to allow the parties an opportunity to determine if the Bureau of Prisons ("BOP") could accommodate the defendant's medical concerns.** (cite omitted)

**In making its decision, the Court gave great weight to the recommendation of the defendant's physician, Dr. Velazquez-Ramirez, who emphasized the necessity of regular application of customized compression sleeves three to four times a day to lessen the likelihood of blood clots in Mr. Burgess' legs.** (cite omitted) **On October 18, 2018, upon assurances that the BOP could accommodate the defendant, the Court imposed an active sentence of 18 months to be followed by three years of supervised released.** (cite omitted) **The judgment included a recommendation that the defendant be designated to a BOP medical facility, specifically the Butner facility, where the "Court is informed through the Bureau of Prisons that Mr. Burgess' specific medical condition can be accommodated . . . and that the accommodation be allowed".** (cite omitted)

**The defendant contends, and the government does not dispute, that Mr. Burgess has not received the intended accommodations, including application of his compression sleeves.** (cite omitted)

**The record shows that the defendant has unique and substantial health problems. The record is also clear that the Court would have imposed a different sentence had it known that the Bureau of Prisons would not accommodate the defendant's customized compression sleeves. The information before the Court suggests that the defendant's health has significantly declined while in the custody of the BOP. For these reasons, the Court finds that the defendant has established extraordinary and compelling grounds for compassionate release.** (emphasis added)

174.    Mr. Burgess was followed on August 21, 2019 by Dr. Velazquez-Ramirez at Wake

Forest Baptist Medical Center who described his history briefly as follows:

Briefly, had removed hx of DVT over ten years ago, with recurrent DVT and PE, filter was placed in first PE occurrence. Has been followed by hematology closely, failed Coumadin and was placed on Xarelto.

**Mr. Burgess is back to see us after being released from jail, he deconditioned significantly while he was incarcerated. His lower extremity edema worsened, including his pain, developed more varicosities in lower extremities and has also developed collateral veins in his abdomen.**

67

**While incarcerated he had another episode of DVT and evidence of thrombus within the filter, acute on chronic. There is a report stating that his anticoagulation was either held or changed during a short period of time. I don't have details, Mr. Burgess states this time was when his symptoms worsened.**

**He was not able to use his compression pumps during that time.**

**Since his release he has been minimally ambulatory, he states his legs hurt significantly and he is not able to do much. He uses a can[e] and wheelchair for long distances. Since he has been at home he started using his compression pumps and elevating his legs more, he feels his symptoms are slowly improving. …(**emphasis added**)**

175.     Mr. Burgess has since followed with his providers at Wake Forest Health in his significantly declined state. Mr. Burgess was also followed at Duke Health in Durham, North Carolina on December 19, 2019 and December 23, 2019 where he was evaluated primarily for chronic recurrent deep vein thrombosis (DVT) of both lower extremities as well as evaluation of potential IVC filter replacement.  Physical exam at that time noted the reason for exam was because of chronic DVTs, swelling, bilateral lower extremity pain and veinous insufficiency.  A CT scan was ordered by Jessica R. Prescott, PA of the abdomen and pelvis to evaluate clotting in and around the IVC filter and pelvis.  In addition, on the same date, an MRI/MRA of the pelvis was also ordered by PA Prescott.  The MRA was interpreted by Marcus R. Luciano, M.D., and Joseph G. Mammarappalil, M.D.  The impression of the interpreters was of:

1. Chronic appearing DVT within the inferior IVC, the bilateral iliac and common femoral veins as above.
2. IVC filter within the infrarenal IVC, with susceptibility artifact limiting evaluation for thrombosis within the filter.  The IVC is patent above and below the filter.
3. Collateral vessels within the anterior abdominal wall and internal iliac system, likely due to prior venous thrombosis.

176.     Mr. Burgess was consulted by the Duke vascular interventional radiology team of Charles A. Robinson, M.D. (resident) and Jonathan G. Martin, M.D. while at Duke on January 21, 2020. Those physicians reviewed his history and discussed with Mr. Burgess the possibility of

68

replacing his IVC filter, which initially had been placed as a lifetime IVC filter placement. The physicians noted that Mr. Burgess' quality of life was severely affected by pain, inability, and edema from his chronic venous insufficiency. Dr. Martin discussed at length the risks, benefits, and alternatives to iliac vein and IVC recanalization with IVC filter removal. The discussions were extensive, and Mr. Burgess was given the opportunity to ask numerous questions. Dr. Martin and Mr. Burgess had email communications during the month of January 2020 about various ways the procedure could be performed and hematological concerns. Ultimately, the issues involving the surgery were referred to Duke Hematology. After considered debate and discussion, including the involvement of Jill Burgess, Mr. Burgess declined an IVC filter replacement surgery when due to the high mortality risk of such a surgery and, because of his advance state of debility, the efficacy of the surgery was questionable.

177. Mr. Burgess entered Butner FCC on or about December 3, 2018 fully able to walk and perform all activities of daily living, able to participate in normal physical activities and function in such a way to perform his job as a cyber security and software expert. Mr. Burgess left Butner FCC on or about July 25, 2019 in a wheelchair with permanent and debilitating injuries that have left him with permanent damage to his veinous system which prevents return blood flow to his heart, and which renders Mr. Burgess physically incapable of performing any strenuous activity. In his current state, Mr. Burgess does not receive adequate return blood flow to his heart, which when performing any physical activity, leaved him gasping for air, because of a lack of oxygenated blood in his system. Currently, if Mr. Burgess were attempt to walk to his mailbox at the end of his short driveway, he would need to stop and rest multiple times during that trip. Any attempts by Mr. Burgess at activity are followed by extended periods of total debility in bed or the equivalent. Mr. Burgess' life activities have been totally and completely disrupted, and he spends

69

75-80% of his time in bed, is virtually unable to participate in any social or other activities outside the home, has detrimentally impacted any ability to perform activities within the home, and has completely precluded marital relations with his wife.

178. Mr. Burgess has been legally debilitated, is unable to walk, sit, stand or perform any activity for any length of time, has been permanently and totally disabled as a result of the injuries as described herein caused by the acts and omissions, negligence and gross negligence by Dr. Valdez and NP Adkins, as well as the unnamed agents and employees of Butner FCC described herein.

179. The negligent and grossly negligent care, as previously set forth herein, caused Mr. Burgess to suffer extensive clotting as described herein, resulting in significant disabilities to his legs, his pulmonary and respiratory systems, and has resulted in extended pain and suffering for seven months while incarcerated, and continues to cause him extensive pain and suffering from the negligence of those care providers as described herein.

180. As a result of the events of Mr. Burgess' incarceration and the medical malpractice as set forth herein, Mr. Burgess was diagnosed as having his post-traumatic stress disorder (PTSD) exacerbated.

181. After leaving Butner FCC, Mr. Burgess returned home to live with his wife, who has had to curtail many of her activities of daily living in order to assist in taking care of Mr. Burgess. As a proximate result of Burgess' disability, Mr. Burgess requires assistance in performing many activities and such assistance will likely increase over time, necessitating attendant care.

182. As a proximate result of his disabilities, and the damage and injuries done to his legs and his vascular system, Mr. Burgess will require extensive medical care to manage his

70

condition in its now advanced form because of the injuries to him while he was incarcerated at Butner. Upon information and belief, Mr. Burgess will also require adaptations to his home and home furnishings that will allow Mr. Burgess to function, and will likely require extensive medical management to and including amputations of his lower extremities.  Mr. Burgess may ultimately need for an IVC filter transplant, to replace the IVC filter that was initially placed and intended for lifelong use.  The IVC filter surgery is one that will come at high risk, and likely only be undertaken when Mr. Burgess is completely unable to function without this device.

183.    As a proximate result of his disability, Mr. Burgess has suffered an economic loss and will continue to suffer an economic loss as he is incapable of employment in his current mental and physical condition.

184.    As a proximate result of his disability, Mr. Burgess will need such other medical treatment and medication regime as recommended by his health care providers.

**FIRST CAUSE OF ACTION**
**(Medical Negligence – Violation of the Standard of Care)**
**(Against Michael Valdez, MD)**
**(Gregory Paul Burgess)**

185.    The allegations contained in Paragraphs 1 through 184 are re-alleged and incorporated by reference as if fully set forth herein.

186.    Defendant USA, by and through Dr. Valdez and other agents and employees, was negligent, and this negligence was a proximate and reasonably foreseeable cause of pain and suffering and significant injury suffered by Mr. Burgess. Defendant breached its duty to care for and treat Mr. Burgess using reasonable and ordinary care in accordance with the skill, training and experience of a physician practicing medicine in the same or similar community in that they:

(a)    failed to act when Mr. Burgess presented with serious medical needs, with a known hypercoagulable disorder with history of multiple DVT and PE, that required immediate

71

action, when such a failure to act caused deterioration of Mr. Burgess' health and significant irreversible loss of function;

(b)     failed to act to ensure that Mr. Burgess, with a known hypercoagulable disorder with history of multiple DVT and PE, by proper Orders was maintained with proper anticoagulation upon arrival at Butner;

(c)     failed to recognize numerous Acute or Emergent medical conditions presented by Mr. Burgess, as mandated by BOP Policy P6031.01, Section 7 and BOP Policy P6031.01, Section 8; when such a failure to recognize caused  deterioration of the inmate's health and significant irreversible loss of function;

(d)     failed to act appropriately on numerous Acute or Emergent medical conditions presented by Mr. Burgess as mandated by BOP Policy P6031.01, Section 7 and BOP Policy P6031.01, Section 8, when such a failure to act caused  deterioration of the inmate's health and significant irreversible loss of function;

(e)     failed to follow BOP Policy P6031.01, Section 12.a.(1)(a-b) by failing to address Mr. Burgess as a complex medical case that mandated ongoing and continuous medical management;

(f)     failed to follow BOP Policy P6031.01, Section 15 by failing to examine Mr. Burgess more frequently as he was a "high risk or medically complex chronic" case;

(g)     failed to properly Triage Mr. Burgess as mandated by BOP Policy P6031.01, Section 17, that mandated proper classification of patients according to priority of need in order to allow "truly urgent conditions to be addressed adequately on the same day;"

72

(h)     failed to follow BOP Policy P6031.01, Section 12.a.(1)(a-b) in their medical duty to deliver complete medical management of Mr. Burgess, to take all necessary actions  and to follow all necessary medical orders to ensure Mr. Burgess' health;

(i)     consistently failed to timely obtain care in testing and timely involve the care of specialist external care providers for Mr. Burgess, with a known hypercoagulable disorder with history of multiple DVT and PE, a patient requiring highly specialized care;

(j)     consistently failed to recognize Mr. Burgess' needs for the anticoagulant Xarelto;

(k)     consistently failed to recognize Mr. Burgess' medical needs for the use of leg sequential compression devices (SCDs), and give orders for Burgess' use of leg sequential compression devices (SCDs) and provide Mr. Burgess with such leg sequential compression devices through the prison system;

(l)     consistently failed to recognize and act upon Mr. Burgess' obvious signs of the development of deep venous thrombosis (DVT);

(m)     failed by allowing Mr. Burgess, with a known hypercoagulable disorder with history of multiple DVT and PE, to go for a period of time with no anticoagulation medication;

(n)     failed to obtain any historical medical records on Mr. Burgess as he was a "high risk or medically complex chronic" case that necessitated a complete understanding of his historical care;

(o)     failed to act and provide care to Mr. Burgess in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged acts giving rise to this cause of action;

73

(p)     failed to exercise reasonable care and diligence in the application of their

knowledge and skill to Mr. Burgess' case; and

(q)     failed to use their best judgment in the care and treatment of Mr. Burgess.

187.    As a direct and proximate result of Defendant's negligence, as herein alleged, Mr.

Burgess endured extended pain and suffering; and was caused to suffer such injuries and damages

as set forth herein.

**<u>SECOND CAUSE OF ACTION</u>**
**(Medical Negligence – Violation of the Standard of Care)**
**(Against Jennifer Adkins, NP)**
**(Gregory Paul Burgess)**

188.    The allegations contained in Paragraphs 1 through 187 are re-alleged and

incorporated by reference as if fully set forth herein.

189.    Defendant USA, by and through NP Adkins and other agents and employees, was

negligent, and this negligence was a proximate and reasonably foreseeable cause of pain and

suffering and significant injury suffered by Mr. Burgess. Defendant breached its duty to care for

and treat Mr. Burgess using reasonable and ordinary care in accordance with the skill, training and

experience of a mid-level practitioner providing care in the same or similar community in that she:

(a)     failed to act when Mr. Burgess presented with serious medical needs, with a known

hypercoagulable disorder with history of multiple DVT and PE, that required immediate

action, when such a failure to act caused deterioration of Mr. Burgess' health and

significant irreversible loss of function;

(b)     failed to act to ensure that Mr. Burgess, with a known hypercoagulable disorder

with history of multiple DVT and PE, by proper Orders was maintained with proper

anticoagulation upon arrival at Butner;

74

(c)     failed to recognize numerous Acute or Emergent medical conditions presented by Mr. Burgess, as mandated by BOP Policy P6031.01, Section 7 and BOP Policy P6031.01, Section 8; when such a failure to recognize caused deterioration of the inmate's health and significant irreversible loss of function;

(d)     failed to act appropriately on numerous Acute or Emergent medical conditions presented by Mr. Burgess as mandated by BOP Policy P6031.01, Section 7 and BOP Policy P6031.01, Section 8, when such a failure to act caused deterioration of the inmate's health and significant irreversible loss of function;

(e)     failed to follow BOP Policy P6031.01, Section 12.a.(1)(a-b) by failing to address Mr. Burgess as a complex medical case that mandated ongoing and continuous medical management;

(f)     failed to follow BOP Policy P6031.01, Section 15 by failing to examine Mr. Burgess more frequently as he was a "high risk or medically complex chronic" case;

(g)     failed to properly Triage Mr. Burgess as mandated by BOP Policy P6031.01, Section 17, that mandated proper classification of patients according to priority of need in order to allow "truly urgent conditions to be addressed adequately on the same day;"

(h)     failed to follow BOP Policy P6031.01, Section 12.a.(1)(a-b) in their medical duty to deliver complete medical management of Mr. Burgess, to take all necessary actions and to follow all necessary medical orders to ensure Mr. Burgess' health;

(i)     consistently failed to timely obtain care in testing and timely involve the care of specialist external care providers for Mr. Burgess, with a known hypercoagulable disorder with history of multiple DVT and PE, a patient requiring highly specialized care;

(j)     consistently failed to recognize Mr. Burgess' needs for the anticoagulant Xarelto;

75

(k)     consistently failed to recognize Mr. Burgess' medical needs for the use of leg sequential compression devices (SCDs), and give orders for Burgess' use of leg sequential compression devices (SCDs) and provide Mr. Burgess with such leg sequential compression devices through the prison system;

(l)     consistently failed to recognize and act upon Mr. Burgess' obvious signs of the development of deep venous thrombosis (DVT);

(m)     failed by allowing Mr. Burgess, with a known hypercoagulable disorder with history of multiple DVT and PE, to go for a period of time with no anticoagulation medication;

(n)     failed to obtain any historical medical records on Mr. Burgess as he was a "high risk or medically complex chronic" case that necessitated a complete understanding of his historical care;

(o)     failed to act and provide care to Mr. Burgess in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged acts giving rise to this cause of action;

(p)     failed to exercise reasonable care and diligence in the application of their knowledge and skill to Mr. Burgess' case; and

(q)     failed to use their best judgment in the care and treatment of Mr. Burgess.

190.     As a direct and proximate result of Defendant's negligence, as herein alleged, Mr. Burgess endured extended pain and suffering; and was caused to suffer such injuries and damages as set forth herein.

76

## THIRD CLAIM FOR RELIEF
### (Common Law Negligence Claims)
### (Against Michael Valdez, MD)
### (Gregory Paul Burgess)

191. The allegations contained in Paragraphs 1 through 190 are re-alleged and incorporated by reference as if fully set forth herein.

192. Defendant USA, by and through Dr. Valdez and other agents and employees, owed Mr. Burgess a duty to care for him in compliance with the common law. Under the common law of North Carolina, a physician or health care provider must (1) exercise reasonable care and diligence in the application of his or her knowledge and skill to the patient's case and (2) use his or her best judgment in the treatment and care of the patient.

193. Defendant USA, by and through Dr. Valdez and other agents and employees, were negligent, and their negligence was a proximate and reasonably foreseeable cause of pain and suffering and permanent injury suffered by Mr. Burgess, as described herein.

194. Defendant USA, by and through Dr. Valdez and other agents and employees, breached their common law duties of care owed to Mr. Burgess in that they did not: (1) exercise reasonable care and diligence in their application of their knowledge and skill to Mr. Burgess' care and (2) use their best judgment in the treatment and care of Mr. Burgess.

195. As a direct and proximate result of Defendants' negligence, that negligence through Dr. Valdez and other agents and employees, as herein alleged, Mr. Burgess endured extended pain and suffering; and was caused to suffer such injuries and damages as set forth herein.

## FOURTH CLAIM FOR RELIEF
### (Common Law Negligence Claims)
### (Against Jennifer Adkins, NP)
### (Gregory Paul Burgess)

196. The allegations contained in Paragraphs 1 through 181 are re-alleged and incorporated by reference as if fully set forth herein.

197. Defendant USA, by and through NP Adkins and other agents and employees, owed Mr. Burgess a duty to care for him in compliance with the common law. Under the common law of North Carolina, a physician or health care provider must (1) possess the degree of professional learning, skill, and ability which others similarly situated ordinarily possess; (2) exercise reasonable care and diligence in the application of his or her knowledge and skill to the patient's case; and (3) use his or her best judgment in the treatment and care of the patient.

198. Defendant USA, by and through NP Adkins and other agents and employees, were negligent, and their negligence was a proximate and reasonably foreseeable cause of pain and suffering and permanent injury suffered by Mr. Burgess, as described herein.

199. Defendant USA, by and through NP Adkins and other agents and employees, breached their common law duties of care owed to Mr. Burgess in that they did not: (1) exercise reasonable care and diligence in their application of their knowledge and skill to Mr. Burgess' care and (2) use their best judgment in the treatment and care of Mr. Burgess.

200. As a direct and proximate result of Defendants' negligence, that negligence through NP Adkins and other agents and employees, as herein alleged, Mr. Burgess endured extended pain and suffering; and was caused to suffer such injuries and damages as set forth herein.

**FIFTH CLAIM FOR RELIEF**
**(Administrative Negligence)**
**(Gregory Paul Burgess)**

201. Paragraphs 1 through 200 of the Plaintiffs' Complaint are realleged and incorporated herein by reference.

78

202.     The Administrative staff of Butner medical, including Jan Brinkley and other unnamed employees and/or agents of the Defendant, owed to Mr. Burgess the duty to provide ordinary and reasonable administrative care in the preparing for Mr. Burgess arrival and to be able to accommodate his unique medical needs with a known hypercoagulable disorder with history of multiple DVT and PE, that required immediate and continuous multispecialty medical care, and when such a failure to provide the necessary care would result in a deterioration of Mr. Burgess' health and cause significant irreversible loss of function. See *Blanton v Moses H. Cone Memorial Hospital, Inc.*, 342 S.E.2d 890, 316 N.C. 374 (1986).

203.     The Administrative staff of Butner medical, including Jan Brinkley and other unnamed employees and/or agents of the Defendant, breached their duties to Mr. Burgess for the reasons set forth herein:

(a)     by failing to gather Mr. Burgess historical medical records to better understand his unique medical needs in order to prepare a plan of action to provide Mr. Burges with the necessary and proper medical care to prevent a rapid deterioration of Mr. Burgess' health, such as to cause a significant irreversible loss of function, or a life-threatening medical crisis;

(b)     by failing to have in place at his assigned placement to the proper level of care commiserate to his medical needs, as promised by representations made by Butner medical to a United States District Court Judge, and as medically necessary as required by Mr. Burgess medical needs as described herein;

(c )     by failing to have in place a multidisciplinary team of healthcare providers who understood Mr. Burgess' unique medical conditions and were sufficiently capable to address his medical needs.

79

(d)     by failing to give instruction to medical staff located at Mr. Buress's incarceration site so as to better understand Mr. Burgess' unique medical needs to allow medical to prepare a plan of action to provide Mr. Burges with the necessary and proper medical care to prevent a rapid deterioration of Mr. Burgess' health, such as to cause a significant irreversible loss of function, or a life-threatening medical crisis.

204.     As a direct and proximate result of Defendants' negligence, that negligence through the Administrative staff of Butner medical, including Jan Brinkley and other unnamed employees and/or agents of the Defendant, Mr. Burgess endured extended pain and suffering; and was caused to suffer such injuries and damages as set forth herein.

## SIXTH CLAIM FOR RELIEF
### (Loss of Consortium )
### (Jill Hudspeth Burgess)

205.     Paragraphs 1 through 204 of the Plaintiffs' Complaint are realleged and incorporated herein by reference.

206.     At all relevant times Plaintiff Jill Hudspeth Burgess was and is the wife of Plaintiff Gregory Paul Burgess.

207.     As a direct and proximate result of Defendant's negligence, as described more completely herein, Plaintiff Gregory Paul Burgess has suffered severe and debilitating injuries. As the result of Plaintiff Gregory Paul Burgess' injuries, Plaintiff Jill Hudspeth Burgess, has suffered and is continuing to suffer the loss of society, companionship and services of her husband, Gregory Paul Burgess.

208.     As a direct and proximate result of Defendant's negligence, Plaintiff Jill Hudspeth Burgess has been damaged as described herein.

80

**WHEREFORE,** Plaintiffs demand judgment against Defendant United States of America for compensatory damages in an amount which will adequately compensate them for Plaintiff Greg Burgess' personal injury, pain and suffering, past and future medical expense, and economic loss damages, and Plaintiff Jill Burgess' loss of consortium claim, plus interest and costs, and any and all other relief to which the Plaintiffs may be entitled.

This the 18th day of March, 2022.

Respectfully submitted,


**LAW OFFICES OF GREGORY M. KASH**

**/s/ Gregory M. Kash**
**GREGORY M. KASH**
**N.C. State Bar # 14203**
**434 Fayetteville Street, Suite 1640**
**Two Hannover Square**
**Raleigh, North Carolina 27601**
**Telephone:  (919) 861-2006**
**Facsimile:  (919) 831-8898**
**Email:  greg@gregkashlaw.com**
**Attorney for Plaintiffs**

# CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2022, the foregoing was electronically filed with the Court

using the CM/ECF system and served via that system on Joan B. Childs at oan.childs@usdoj.gov

and Brandon D. Zeller at brandon.zeller@usdoj.gov,

Respectfully submitted,

**LAW OFFICE OF GREGORY M. KASH**

**/s/ Gregory M. Kash**
**GREGORY M. KASH**
**N.C. State Bar # 14203**
**434 Fayetteville Street, Suite 1640**
**Two Hannover Square**
**Raleigh, North Carolina 27601**
**Telephone: (919) 861-2006**
**Fax: (919) 831-8898**
**Attorneys for Plaintiffs**